(No. 10223.—Rule made absolute.)

THE PEOPLE *ex rel.* The Chicago Bar Association, Relator, *vs.* MARK J. SULLIVAN, Respondent.

*Opinion filed June 21, 1917—Rehearing denied October 5, 1917.*

1. DISBARMENT—*when writing a letter by an attorney need not be considered as a separate charge.* Where the writing of a letter by an attorney is only an incident in the chain of events bearing on his conduct in the entire litigation for which he is being subjected to disbarment proceedings, it is not necessary to consider the writing of the letter as a separate charge but all the attorney's conduct in the litigation must be considered together.

2. SAME—*attorney should not sacrifice client's interests by withdrawing from his case.* An attorney is not bound to take a client's case nor to continue to act as attorney in the matter if he afterwards learns facts which will justify him in withdrawing, but in such case the attorney should not treacherously desert his client and sacrifice his interests.

3. SAME—*an attorney should not reveal anything to his client's disadvantage.* An attorney who has once accepted employment, even if he afterwards withdraws, should not do anything or divulge anything which he has learned by reason of being such attorney which will be to his former client's disadvantage.

INFORMATION to disbar.

JOHN L. FOGLE, (ALBERT G. WELCH, of counsel,) for relator.

J. K. McMAHON, for respondent.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Pursuant to leave granted, an information was filed against the respondent seeking his disbarment for unprofessional conduct while acting as attorney for T. D. McCarthy. It was charged in the information that the respondent, while engaged as attorney for McCarthy in collecting certain notes owned by him, wrote a letter to McCarthy and failed therein to inform him that he was receiving the sum of $2500 as a settlement for said notes, and that the whole

tenor and effect of the letter manifested a total disregard upon the part of the respondent of the moral obligations of his office as an attorney at law and such a lack of moral character as renders the respondent unfit to be an attorney and counselor at law of this State. Respondent was also charged with receiving $2500 in settlement of said notes and appropriating the same to his own use and cheating and defrauding his client, McCarthy, out of said sum, and was also charged with depriving him of said notes and preventing him from collecting the indebtedness secured by said notes. Respondent answered, denying that he at any time held for collection the notes mentioned in the information or that he was at any time retained by McCarthy in any of his civil affairs, but without a retainer he consulted McCarthy as to his possible defenses against charges that might be made against him by the South Bend Life Assurance Company; that he, with McCarthy, had been made a party defendant to a bill in chancery to restrain the transfer and collection of said notes. He denied that he received or had any agreement to receive $2500 in settlement of the said notes, and denied that he received $2500, or any other sum, for the surrender of any notes in which McCarthy had an interest, and denied generally all charges in the information. The cause was referred to a commissioner, who heard a part of the evidence on behalf of the relator and then asked to be relieved because of having been associated with the attorney for the relator who was acting in the disbarment proceedings. The cause was thereupon referred to another commissioner, who heard the rest of the testimony and filed his report, finding from the evidence that although a very strong case had been made out against the respondent, the circumstances surrounding the case, especially the alleged paying out of the money, were of so unusual and suspicious a character that much more than a reasonable doubt existed in his mind as to the guilt of the respondent; that, in fact, he believed the respondent did

not accept or receive the sum of $2500, or any other sum of money, for the surrender of the Tallyn notes, as charged in the information, and therefore recommended that the information be dismissed and the respondent be exonerated. Objections were filed to the report, among others that the commissioner failed to find that the entire course of action of the respondent from the inception of the matter was unprofessional and dishonorable and constituted malfeasance in his office as an attorney, and that the sacrifice of his client's interests by the dismissal of his suits and the delivery and cancellation of the notes was fraudulent. The objections were overruled, and by stipulation of the parties the objections stand as exceptions on the hearing in this court.

From the evidence it appears that McCarthy was in the year 1913 engaged in selling stock in the South Bend Life Assurance Company. In June of that year he sold 440 shares of the capital stock of said company, at $30 a share, to N. O. and E. M. Tallyn, of Woodford county, Illinois. In payment for this stock each of the Tallyns executed a note for $6600, payable to himself. These notes were by them respectively indorsed and delivered to McCarthy. McCarthy claimed a commission of $9 a share in making this sale, or $3960. He delivered the notes to one Stout, the president of the company, according to his testimony, and Stout handed them back to him with instructions to negotiate and sell them if he wanted his commissions. A dispute subsequently arose between McCarthy and Stout as to whether it was stock of the company or stock belonging to Stout that had been sold. McCarthy was also claiming some $19,000 from Stout and the assurance company for commissions for the sale of other stock and for services. McCarthy retained possession of the notes. Shortly thereafter he endeavored unsuccessfully to negotiate the notes at Peoria, Chicago, and other places. The Tallyns did not receive the stock, and they engaged a firm

of attorneys, O'Bryan & Marshall, in the matter, and the latter made an attempt to get the notes back. Shortly afterwards McCarthy consulted the respondent, informing the respondent fully, as he claims, about his possession of the notes and his transactions in the matter and his claims against Stout and the assurance company. It appears from the evidence, and the commissioner found, that on July 28, 1913, McCarthy employed the respondent as his attorney to collect the notes of N. O. Tallyn and E. M. Tallyn, and the respondent accepted said employment and advised McCarthy to get the notes into the hands of a third party, so that legally he would be within the law in getting the full amount, and McCarthy turned the notes over to the respondent for collection and received from him a receipt in the following words and figures, written on one of respondent's letter-heads:

*"July 28, 1913.*

"Received of Mr. T. D. McCarthy two notes, (judgment,) one dated June 27, 1913, for sixty-six hundred dollars ($6600) and signed N. O. Tallyn, and the other note dated June 27, 1913, for sixty-six hundred dollars, ($6600,) signed E. M. Tallyn. It is understood that Mr. McCarthy has placed these notes in the possession of Mark J. Sullivan, as his attorney, so that he may attend to any legal proceedings that may develop in connection therewith and for the purpose of enforcing said Mr. McCarthy's lien on same."

On the back of a copy of said paper which was retained by the respondent there was written by the respondent and signed by McCarthy the following: "I hereby appoint Mr. Sullivan as my attorney, and agree to pay him for collection of within amounts on notes fifty per cent of all he collects over and above $6600 and $3000 of all under." It is claimed by McCarthy that the words "and $3000 of all under" were not on said paper when he signed it. The respondent claims that the paper is now in the same condition it was when signed by McCarthy. The question whether this contract was changed after it was signed by McCarthy by the addition of the words "and $3000 of all under" is

only material as affecting the credibility of the witnesses. McCarthy testified that prior to the time he employed the respondent he was offered by Stout the amount of one of the notes, or $6600, for a settlement of his claims. If this was true,—and this testimony is not disputed,—then naturally McCarthy did not hesitate to contract to divide what could be secured over and above $6600, as he could get that amount anyway, and he would naturally not want to pay in settlement any part of the amount already offered and that he could secure without legal assistance. Shortly afterwards O'Bryan & Marshall, attorneys for the Tallyns, served notice on McCarthy and Sullivan that no consideration had been given for the notes and no stock delivered to the Tallyns and demanded that the notes be returned and canceled. The respondent then advised McCarthy to give the notes to someone else temporarily, and the respondent claims they were delivered and held for some time by an attorney, James T. Brady, who has since died, and then returned to the respondent.

On August 9, 1913, each of the Tallyns filed a bill in chancery in the superior court of Cook county against McCarthy and Sullivan to enjoin them from transferring or enforcing collection of the notes and asking that the notes be canceled and returned to them. The respondent appeared and acted in said proceedings as the attorney and solicitor for McCarthy and also entered his appearance and filed a disclaimer in his own behalf. A preliminary injunction was granted but was afterwards set aside and dissolved on May 7, 1914. Thereupon the notes were transferred by McCarthy to Frank D. Follansbee, a friend and office associate of the respondent, as was also Joseph Mahon, an attorney at law who thereafter appeared for Follansbee and procured judgments by confession in favor of Follansbee and against the Tallyns, respectively, for the amount of principal and interest due upon each of said notes. It further appears from the evidence as found by the commis-

sioner that the transfer of the notes from McCarthy to Follansbee and the procurement of Mahon to act as attorney for Follansbee were done on the advice of the respondent. The commissioner further found, and we think the finding is amply supported by the evidence, that the notes were transferred by McCarthy to Follansbee without consideration, by direction of the respondent while acting as attorney and solicitor for McCarthy, in order to avoid and overcome possible defenses which makers of the notes might urge against them in the hands of McCarthy and claims which the South Bend Life Assurance Company and Stout might have to said notes, and that Follansbee, in the proceedings had in his name in respect to said notes, acted only as the agent of McCarthy and under instructions of the respondent as the attorney of McCarthy, and that Mahon was simply an agent of the respondent in carrying out the respondent's orders.

Judgment was entered on said notes by confession on July 6, 1914, in favor of Follansbee and against N. O. Tallyn and E. M. Tallyn, respectively, for the amount of principal and interest then due upon said notes, amounting to the sum of $7021 on each note. Thereafter the Tallyns employed John W. Creekmur as their attorney, and he, together with John F. Hopkins, an attorney in his office, procured the vacation of said judgments and the cases were placed upon the trial calendar of the court for trial upon the merits. In May, 1914, Stout had filed a bill in the superior court of Cook county to enjoin McCarthy and Sullivan from selling or transferring the notes. After the confessions of judgments Follansbee was made a party to this suit. McCarthy had also brought a suit in assumpsit by respondent, as his attorney, against Stout and the South Bend Life Assurance Company for $19,000, and issues had been joined in that suit. In all there were pending at that time six separate suits, being the two *cognovit* suits of Follansbee against the Tallyns on which the judgments by

confession had been set aside and which were pending as suits in assumpsit, the assumpsit suit brought by McCarthy against Stout and the assurance company for $19,000, the bill in chancery filed by Stout and the South Bend Life Assurance Company against McCarthy, Sullivan and Follansbee, and the two suits in chancery brought, respectively, by N. O. Tallyn and E. M. Tallyn against McCarthy and Sullivan to enjoin the collection of the two notes. Afterwards the two suits pending on the confessions of judgments which had been set aside, in which Follansbee was the plaintiff and the Tallyns, respectively, were defendants, were placed on the short-cause calendar.

This was the situation on December 11, 1914, on which date Creekmur called the respondent on the telephone, asking him if he was the attorney in the Tallyn cases and requesting him to come to his office and have a talk about the cases. The respondent did go to Creekmur's office and they had that interview, and possibly another within the next few days. As to what took place at this interview the testimony of the respondent and Creekmur is in sharp conflict. Both agree that Creekmur stated, in effect, to the respondent that McCarthy, to whom the notes had originally been given by the Tallyns, was a swindler; that no consideration had been given for the notes; that the transfer of the notes by McCarthy to Follansbee was colorable, merely, and made for the purpose of cutting off defenses; that he had sent detectives to Woodford county to investigate McCarthy, and he had ascertained that he had secured other notes from unsuspecting persons in fraudulent transactions, and that they had consulted the State's attorney of that county and taken the matter before the grand jury, and they were going to have McCarthy prosecuted and would get everybody connected with McCarthy into trouble and would disbar all lawyers connected with the matter. Creekmur also stated that the cases were on the short-cause calendar and he would have to get ready to try them or make

an effort to settle, and that, while his clients had been de-
frauded and the respondent and Follansbee and others con-
nected with the matter were at fault, he would be willing
to buy peace if it could be done for a reasonable sum, and
he offered to pay $1000 in settlement.    Sullivan offered
to settle by giving up one of the $6600 notes, the other
note to be paid in full.    Creekmur also testified that they
had another talk within the next few days in which there
was further talk of a settlement, at which Creekmur finally
offered $2000 and respondent came down to $3000 and they
split the difference, and it was finally agreed that the Tal-
lyns should pay $2500 in settlement of the suits on the two
notes and all suits were to be dismissed.    The respondent
left Creekmur's office and within ten or fifteen minutes Ma-
hon came to the office with the stipulations, prepared to
dismiss all the suits, and submitted the same.    Creekmur
inquired for the notes, and Mahon said that the notes had
been turned over to the respondent, to be delivered when
the settlement was finished.    The respondent admits that he
had one conference with Creekmur, but denies there was
any talk of settlement or any agreement made for a settle-
ment.    He further claimed, in effect, that he was greatly
frightened at the threats made by Creekmur in regard to
having McCarthy indicted and proceedings commenced,—
so much so that because of said threats and the informa-
tion received from Creekmur of McCarthy's character and
crookedness he returned to his office in a state of pertur-
bation and informed Follansbee and Mahon of what had
happened and was instructed by Follansbee to dismiss the
suits.    Follansbee testified that the respondent informed him
after the interview with Creekmur that he had discovered
a lot of things about the case that he was not formerly ac-
quainted with and was going to dismiss the case or thought
they should dismiss the case.    Follansbee told him to go
ahead; that he didn't know anything about the case in de-
tail then any more than he did before, and to do what he

279 — 41

thought was best. The respondent called up McCarthy's house on the telephone and ascertained from Mrs. McCarthy that her husband was in Fargo, North Dakota, whereupon he wrote to McCarthy the following letter, which is made the basis of one charge against the respondent:

*"Dec. 12, 1914.*

*"Dear Mac:* A leak has developed in the Tallyn matter which endangers Follansbee, Mahon, Butler, yourself and me and from which we are all running to safety. This is due to too much talking and inside information. They have, apparently, more information from somebody about the affair than you or I could give them, and criminal action, as well as bar association proceedings, are now threatened unless notes are delivered immediately and Follansbee's suit dismissed. Short notice on this score was served on us yesterday by Creekmur. I called your house and got this address. This is all due to too many people being involved in the matter, and it is not surprising that under circumstances that somebody should turn traitor. You left us in the lurch by not being here for short-cause matter and Meagher never showed. You promised to be here before now, and short-cause matter was timed accordingly. Can it be that you treat the matter as a joke in the face of the risk you know we are all running? Mr. Mahon and Mr. Follansbee have signed a stipulation to dismiss case and turn over notes, providing immunity, civil and criminal, can be secured for all. This immunity will have to be in writing. Mrs. McCarthy and I talked over 'phone to-day and we decided this was the only salvation. Wire me at once. You have caused me endless trouble by placing too much confidence in your acquaintances and supposed friends. They have had two men working on these cases all the time and secured affidavits contradicting some which we obtained. Who has furnished the information it will be hard to find out. According to Creekmur more than one had been helping them out. Who is that man you brought in one day and made him give us that affidavit? This is tough to see all my labor go up in smoke. (?) Don't stand there and laugh now. Get on the firing line just once. Wire me sure. Yours in haste.        SULLIVAN.

"Destroy this letter at once, or, better still, mail it back to me and I will be sure it is safe."

It is not necessary to consider the writing of this letter as a separate charge against the respondent, as it was only an incident in the chain of events bearing on the respondent's conduct in the entire litigation, all of which must be considered together. The letter was received by McCarthy,

but he did not write or telegraph the respondent. McCarthy returned to Chicago on December 20, following. Shortly after the last interview between the respondent and Creekmur the latter left on a business trip to Pennsylvania, returning on the morning of December 19, leaving the matter of the Tallyn suits in the hands of an attorney in his office, DeWolf. On the morning of December 19 one of the Tallyns arrived in Chicago bringing with him a bank draft for $4000, which he took to the office occupied by Creekmur, Hopkins and DeWolf and turned the draft over to Hopkins. Hopkins took this draft to his bank, deposited it to his account, withdrew $2500 in currency on his own check and returned to the office. About ten o'clock the respondent appeared at the office and delivered to Hopkins the two original notes executed by the Tallyns, for $6600 each, and stipulations properly signed for the dismissal of all the litigation then pending between the parties. Hopkins wrote across the face of each note, "Settled for $1250." Hopkins testified that he handed the respondent $2500 in currency. The respondent denied that he ever received in the transaction the sum of $2500 or any sum whatever. He admits that he was in the office of Creekmur and Hopkins at the time it is alleged this payment was made and that he delivered the notes and stipulations, but that he did so voluntarily, for the purpose of getting the suits dismissed to which he was a party and getting out of the difficulties in which he had been involved by McCarthy. He claims that he acted as attorney for McCarthy only in the suits in which he had appeared as attorney or solicitor for him, and that Mahon, who was attorney of record in the *cognovit* suits and who signed the stipulations to dismiss them, is responsible for such action.

There is no doubt that one of the Tallyns brought a draft for $4000 to Chicago and turned it over to Hopkins. Of this amount $1500 was to go to Creekmur and Hopkins for their fees and charges, as they testified. It is not dis-

puted that Hopkins took $2500 in currency to his office. Either he gave it to the respondent, as he testified, or else kept it himself. The only direct evidence of the payment of this money is that of Hopkins. There is evidence of Hopkins that the money was paid and of respondent that it was not paid, and if this were the only charge against respondent we could not say that the commissioner was wrong in recommending that the respondent be exonerated. The circumstances of the case, however, are against respondent. If his story is to be believed, he was frightened by Creekmur into abandoning all of the suits and litigation which he had conducted as attorney, either in his own name or through Follansbee and Mahon, on behalf of McCarthy, and into surrendering without a fight and yielding up the notes and all claims. In the first place, this is entirely incompatible with his previous conduct as an attorney in McCarthy's behalf. He had accepted employment by McCarthy, and, so far as the evidence shows, had handled his affairs as an attorney with such skill and persistence as may or may not have been worthy of a better cause. We express no opinion as to the merits of McCarthy's claims in the litigation or the methods employed by the respondent to advance his client's interests. The respondent had taken McCarthy's case as an attorney and was bound to go through with the consequent and necessary litigation or get out of McCarthy's employ honorably. As far as is shown by the record, McCarthy had at least some claim to the notes or the proceeds thereof and had possession of them, and all the matters involved could have been threshed out and determined in the different suits that were pending. It is apparent that up to the time of respondent's interview with Creekmur, on December 11, 1914, he had as a lawyer conducted the litigation he had advised and instituted in behalf of McCarthy efficiently and fearlessly and to that point successfully. Not only is the story of the respondent incompatible with his previous actions

but it is unreasonable. While McCarthy may have been a swindler, all attempts to prove him such or reach him by criminal process or implicate him in such a way that it would affect his recovery on the notes had apparently not met with success, and, without going into all the evidence on that point in the record in detail, from all that appears from the record, McCarthy, or Follansbee acting for him as his colorable assignee, had better than a fighting chance to recover the full amount of the two notes against the Tallyns, and we must assume that no one knew the circumstances better than the respondent. It is unreasonable to believe that he first learned from Creekmur about McCarthy and his interests. McCarthy, as a matter of fact, had not been indicted and was not being prosecuted criminally, as far as the record shows. It is also unreasonable to suppose that respondent would surrender at that stage of the proceedings, when there was a chance of recovery, without receiving anything and see all of his previous work wasted, or, as he expressed it in his letter to McCarthy, "go up in smoke." Such action was entirely foreign to his previous conduct in the litigation. We are forced to the conclusion that it was the prospect of ready money, and not fright, that impelled his actions.

Again, if it is true, as the respondent stated, that he determined to abandon the litigation and turn over the notes and drop everything in behalf of McCarthy, it is most singular that he waited to deliver the stipulations and the notes until the exact time the money which Creekmur testified had been agreed upon as the amount of settlement, arrived in Chicago. He could have turned over the stipulations and the notes at any time after his interview with Creekmur, on December 11 or 12, and his subsequent interview with Follansbee and Mahon. It is true, he claims that he desired to get word from McCarthy, and for that reason may have waited a reasonable time for a telegram or a reply to his letter of December 12; but that does not

explain why he waited until Tallyn arrived in Chicago with the money, and then, within a few minutes after Tallyn arrived at Creekmur's office, also appear there and not until then deliver the stipulations and the notes. In any way in which the matter can be viewed the conduct of the respondent as an attorney was reprehensible. No matter about McCarthy or his case. The respondent had taken his business. He was not bound to do this in the first instance, nor to continue to act as his attorney after he had taken his case if he afterwards learned facts which would justify him in withdrawing. In such event, however, there should have been a full and fair explanation and an opportunity given to his client to procure other counsel. The most irresponsible litigant, or one accused of crime, for that matter, is entitled to that. An attorney cannot act both as attorney and judge for his client. Nor can an attorney who has once accepted employment, even if he afterwards withdraws, do anything or divulge anything which he has learned by reason of being such attorney which will be to his client's disadvantage. No reason is given, and we can imagine none, for the action of the respondent in assuming to turn over the notes of his client and dismissing the suits, he had caused to be begun for him without giving the latter full opportunity to get other counsel to protect his interests. The least that the respondent should have done would have been to withdraw as attorney of record in the cases wherein he was attorney of record and counsel Mahon to do the same, then return McCarthy his notes and take his receipt for the same and cancel his contract of employment. Had such action been taken McCarthy could have employed other counsel, and, in any event, the court would not have dismissed the suits without notifying McCarthy and giving him a chance to employ other counsel. In any light in which the conduct of respondent can be viewed, his action in the premises was a deliberate and willful abandonment and sacrifice of his client's interests, and such conduct,

in an attorney cannot be tolerated. In military law the punishment of death is provided for a soldier who in time of battle treacherously yields or pusillanimously cries for quarter. According to the ethics of the legal profession disbarment is the penalty for the attorney who, having accepted employment, treacherously deserts his client and sacrifices his interests. In this case the respondent is accused of appropriating to his own use money received in settlement of his client's case, and also of having deprived his client of notes put in his hands for collection and prevented him from collecting the indebtedness secured by the said notes. While there is some doubt, as found by the commissioner, about the truth of the first charge, there is no doubt about the last, and under the circumstances of the case one charge was as grave as the other so far as respondent's client was concerned.

As we view the case, we feel it our duty, disagreeable though it may be, to sustain the objections to the commissioner's report and to make the rule against the respondent absolute.

*Rule made absolute.*