(No. 32528.

IN RE CHARLES J. MICHAL, Attorney, Respondent.

*Opinion filed May 20, 1953.*

CHARLES LEVITON, of Chicago, *amicus curiae.*

HOWARD B. BRYANT, of Chicago, for respondent.

Mr. JUSTICE DAILY delivered the opinion of the court:

This is a disciplinary proceeding which brings to our consideration a report of the Board of Managers of the Chicago Bar Association, acting as commissioners of this court, wherein it is recommended that Charles J. Michal, the respondent, be suspended from the practice of law for a period of three years because of conduct and practices tending to bring the legal profession into disrepute.

The complaint made against respondent stemmed from his relationship with his client Joseph Fakan, a lifelong friend whom respondent represented and advised in legal matters for a period extending from 1912 to Fakan's death in 1948. The sequence of events which have come under scrutiny date from October 31, 1928, when Fakan's first wife died. At that time Fakan was engaged in a successful undertaking and garage business and was the owner of seven parcels of unencumbered real estate. On November 24, 1928, respondent prepared a partnership agreement between Fakan and his daughter Lillian, which recited that they were to be partners in the undertaking and garage business, that each was to furnish an equal amount of capital and that the profits were to be shared in the same manner. There is some evidence in the record that the agreement was entered into in order to placate Lillian in her hostility to her father's intention to remarry. Besides preparing the agreement, respondent was also a witness to its execution. On December 13, 1928, Fakan executed three trust deeds on his property which were made to secure accompanying notes in the sum of $40,000. These instruments were also prepared by respondent and were acknowledged before one of his employees. The trust deeds were

not recorded until March 18, 1929, and, after recording, were placed in respondent's box at the recorder's office.

On the day following the execution of the trust deeds and notes, Fakan and one Stefanie Janous, a domestic thirty years his junior who neither read, wrote nor understood English, entered into an antenuptial agreement which had been prepared by respondent at Fakan's request. The agreement recited that Fakan had established an undertaking business with the aid of his children and that he was the owner of seven parcels of real estate; that Stefanie was possessed of no property and that she was aware that Fakan's property was encumbered to secure debts and loans; that Fakan would furnish her with a home and necessities and that she in turn would accept the sum of $5000 upon his death in lieu of all rights of dower and in full settlement of any and all rights she might have in his estate by virtue of the laws of descent. In addition, the agreement contained a signed statement by Stefanie that its contents had been explained to her, that she understood the agreement and would abide by it. An employee in respondent's office acknowledged the signatures of the parties. On December 15, 1928, the day following, Fakan and Stefanie were married, and lived together until his death in April, 1948. Sometime subsequent to his death, Stefanie found the trust deeds and the notes they secured among decedent's papers and delivered them to the respondent. The notes had never been negotiated.

While there are other incidents of respondent's conduct yet to be related, we pause here to consider the events up to this point. The inescapable conclusion to be reached from the evidence related is that Fakan executed the trust deeds, notes and the antenuptial agreement with the intention of defrauding Stefanie Janous, who was to become his wife. As we view the report and findings of the commissioners, a determination of whether respondent's conduct involved moral turpitude depends greatly upon when

it can be said he became aware of the fraud that had been practiced upon Stefanie. Respondent insists that he did not acquire such knowledge until after Fakan's death, when Stefanie brought him the unnegotiated notes and in support of his position points out that, prior to Stefanie's discovery, he had filed an inventory in Fakan's estate showing that the real estate was encumbered by the trust deeds. The *amicus curiae,* however, interprets the evidence, and respondent's testimony in particular, as showing that respondent was either a party to the fraud or had knowledge of it from the beginning. We shall not belabor the evidence on this point, for the conclusions to be reached from it are entirely circumstantial and do not, in our opinion, establish to a moral certainty either that respondent was a party to Fakan's scheme or that he was patently aware of its fraudulent purpose. Only clear and satisfactory proof can justify a decision from which flows the grave consequence of disbarment of an attorney and destruction of his professional life. *In re Donaghy,* 402 Ill. 120; *People ex rel. Deneen* v. *Matthews,* 217 Ill. 94.

It does emerge clearly from the evidence, however, that respondent was aware that the trust-deed notes had not been negotiated and that Fakan's property was not in fact encumbered when the antenuptial agreement was entered into. Respondent knew, therefore, or should have known, that the disclosure of Fakan's property was not such a *bona fide* disclosure as is necessary to a valid antenuptial agreement. He defends his conduct by saying that he fully relied upon Fakan's assurance that the notes were to be negotiated. While we are not constrained to say that his act made him a party to fraud, it is our opinion that his loose handling of legal documents in such a manner that his client could bend them to fraud is practice which merits censure.

Continuing with the facts pertinent to the complaint against respondent, we return to a date seventeen years

after Fakan and Stefanie were married. On that day, October 15, 1945, Fakan executed his last will and testament, which document was drawn for him by the respondent. By its provisions, Fakan bequeathed his personal property and household effects to Stefanie and directed that she have the use of his home, rent free, for three years. There followed a bequest to her of $5000 reciting that it was in full settlement of all her rights of dower and descent and that it was made in conformity with, and in discharge of, their antenuptial agreement. By other provisions, Fakan's business was bequeathed to his daughter Lillian in trust for three grandchildren; a daughter, Anna, was given a small bequest and it was directed that Lillian was to receive the residue of the estate. An additional provision was that the legal services of respondent be retained by Lillian, the trustee, and by Stefanie, the executrix.

Fakan died in April, 1948, and soon thereafter respondent, representing Stefanie as executrix, caused the will to be admitted to probate and letters testamentary to be issued to her. He also prepared and filed an inventory and, thereafter, a petition for a widow's award which was allowed in the sum of $2000, although it was later set aside on Lillian's petition. Sometime after the award was allowed, specifically in December, 1948, is when Stefanie purportedly found the unnegotiated notes and turned them over to respondent. In January, 1949, Stefanie filed a renunciation of the will and respondent thereupon presented a petition praying that she be appointed administratrix with will annexed.

The next event of consequence occurred in March, 1949, when Anna Fakan Caithamer, a daughter of decedent, filed a complaint in the superior court to contest the validity of the will, alleging mental incapacity of the testator and undue influence by Lillian. Stefanie was made a party defendant both as an individual and as executrix and, acting in her behalf, respondent filed an answer which

denied that Fakan lacked mental capacity or that the will was improperly executed. The answer did, however, contain an allegation that Lillian exercised a dominant influence and control over her father and that he had feared her.

The final event which concerns us here came to pass in May, 1949, when respondent, again representing Stefanie, filed a complaint in the superior court to invalidate the antenuptial agreement on the ground that it had been obtained by fraud and to cancel the trust deeds and notes on the ground that they were undelivered and without consideration. Among other things, the complaint attacked Fakan's partnership agreement with Lillian as a sham. Its prayer was that Stefanie recover all interests in Fakan's estate accruing to her as his wife and widow and that a decree of partition be entered.

It was respondent's activities after Fakan's death which generated the complaint against him and, after hearing the evidence, the commissioners found that his conduct of actively attempting to overthrow the validity of the antenuptial agreement, the partnership agreement, the will and mortgages made by his client, Joseph Fakan, constituted unprofessional and unethical conduct, involving moral turpitude, which tended to bring the profession of law into disrepute. Respondent excepted to the finding of the commissioners.

Generally speaking, it is the contention of the *amicus curiae* that respondent was disloyal to his client, Fakan, and violated the canons of ethics when he attacked the very legal instruments that he had drawn for the client and when he drew upon privileged knowledge of his client's affairs as a basis for the attack. For his part, respondent urges that the situation became changed when, after Fakan's death, he discovered that the notes had not been negotiated and that it then became his duty to rectify the fraud that had been practiced upon Stefanie. He reasons from this that his actions in attempting to upset the will, the ante-

nuptial agreement and trust deeds were ethical and proper, and honestly motivated. *Amicus curiae* counters this contention by pointing out that respondent first sought to overthrow the will and antenuptial agreement by securing a widow's award at a time when he was not yet aware that the notes were unnegotiated. From the limited knowledge that this record gives us of the facts, circumstances and basis of the petition for the widow's award, we are not inclined to construe respondent's action as an effort to run counter to the terms of the agreement, because we are aware that it is oftentimes a mixed question of law and fact as to whether the language of an antenuptial agreement may be said to bar a widow's award. (See: *Yockey* v. *Marion,* 269 Ill. 342; *Pavlicek* v. *Roessler,* 222 Ill. 83.) We shall not adjudicate that question in this proceeding and we conclude that respondent was within legal bounds in deviating to this extent from the terms of his client's will.

There remains, however, the fact that respondent did attempt, first, to cast doubt on the validity of Fakan's will by the allegation that Lillian exercised a dominant control and influence over her father, and, second, to overthrow the will, the antenuptial agreement and the encumbrances his client had executed, by the complaint for partition filed in Stefanie's behalf. In both instances, as well as in his testimony before the commissioners, it appears without doubt that respondent drew upon confidential knowledge of Fakan's affairs to make the attacks, and created an irreconcilable conflict in his loyalties by so doing. Canon 6 of the Canons of Legal Ethics of both the Illinois State and Chicago Bar Associations, provides as follows: "The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed." Still another guide in our consideration of respondent's

conduct is found in an opinion rendered by a committee of the American Bar Association, which states: "The attorney should not attempt to nullify his own works. He drew the instrument and cannot attack its validity after his client has died and his services are sought by new clients. The death of the former client does not release the attorney from the obligation." (Opinion 64, ABA Opinions of the Committee, 1947.) Though not always arising in disbarment proceedings, this court has had occasion to express its views of the principle involved. In *People v. Gerold,* 265 Ill. 448, we commented that an attorney owes to his client fidelity, secrecy, diligence and skill and that he cannot undertake to represent conflicting interests or to discharge inconsistent duties which may cause a breach of the trust due his client no matter how honest may be his motives or intentions. The same case states that it is a general rule that an attorney is not allowed to divulge information and secrets imparted to him by his client or acquired during their professional relation unless authorized to do so by the client himself. Similar principles are expressed in *People ex rel. Livers v. Hanson,* 290 Ill. 370; *People ex rel. Chicago Bar Assn. v. Sullivan;* 279 Ill. 634; *Strong v. International Investment Union,* 183 Ill. 97; and *Farwell v. Great Western Telegraph Co.* 161 Ill. 522. That the view in this jurisdiction represents the universal rule is borne out by 5 Am. Jur, Attorneys at Law, sec. 268, where it is stated that an attorney may not use in behalf of his second client, and against a former client, information acquired in the employment of the latter.

The record in this case admits of no doubt that respondent represented Fakan, and Fakan only, when he drafted the legal instruments involved. Loyalty to his client alone should have prevented respondent from attacking them after Fakan's death, yet we find him further deviating from his trust by using his knowledge of his first client's affairs to assist his new client. It should be

remembered too that Stefanie's interests are not the only ones at stake, for others would suffer if respondent were successful in upsetting Fakan's studied and expressed plan for the distribution of his estate. If the respondent suspected fraud, as he said he did, it was, of course, perfectly proper for him to advise the widow that she might have been victimized, but it was his further duty to advise her to employ other counsel to represent her in the matter. It is only by such a method that he could avoid the representation of conflicting interests and maintain his trust to Fakan. The result of his failure to pursue such a course is made manifest by this record. Respondent has placed himself in a position where he is charged with fraud, where he has sought to dishonor the services he performed for Fakan and where he has been caused to use knowledge gained from his former client in behalf of his new client. In so dividing his loyalties and deserting the cause of his former client, it is our opinion that the commissioners were correct in finding that respondent was guilty of conduct which tends to bring the legal profession into disrepute. As stated in *United States* v. *Costen,* 38 Fed. 24: "It is the glory of the legal profession that its fidelity to its client may be depended upon; that a man may safely go to a lawyer and converse with him upon his rights in litigation with absolute assurance that that lawyer's tongue is tied from ever discussing it; and any lawyer who proves false to such obligation, and betrays, or seeks to betray, any information or any facts that he has obtained while employed on the one side, is guilty of the grossest breach of trust." Where the confidence in the individual lawyer is abused, as it was in this case, the profession suffers by loss of the confidence of the people.

We think that respondent's actions were something more than "indiscretions," as he describes them, and that his failure to obey the profession's standards of loyalty, trust and confidence cannot be condoned, and merits suspension.

However, in view of the fact that we do not impute the fraud to respondent's actions that the commissioners did, and in view of his age, long practice and hitherto unchallenged standing, we fix the period of his suspension from the practice of law at one year.

*Respondent suspended.*