WESTINGHOUSE ELECTRIC
CORPORATION, Plaintiff,

v.

GULF OIL CORPORATION,
Defendant-Appellant,

and

United Nuclear Corporation,
Defendant-Appellee.

No. 78–1700.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 26, 1978.

Decided Dec. 8, 1978.

Rehearing and Rehearing In Banc
Denied Feb. 9, 1979.

John Bodner, Jr., Washington, D. C., for defendant-appellant.

Edward H. Hickey, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Circuit Judge, WISDOM, Senior Circuit Judge,* and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

In this case we review the propriety of a district court's refusal to grant a motion to disqualify opposing counsel. The issues presented are whether there is a sufficient relationship between matters presented by the pending litigation and matters which the lawyers in question worked on in behalf of the party now seeking disqualification and whether the party seeking disqualification has given legally sufficient consent to the dual representation.

I

This case arises as one aspect of the complex litigation filed by Westinghouse against a number of parties engaged in, or having interests in, the mining of uranium. That suit alleged that increases in the price of uranium, which had encouraged Westinghouse to default on long-term uranium supply contracts, resulted from an international cartel which was alleged to have "fixed and increased the price of uranium to purchasers within the United States; . . . allocated, divided and curtailed the supply of, and market for, uranium; . . . boycotted certain uranium purchasers . . .; and . . . otherwise eliminated competition among defendants. . . ." The movant here, Gulf Oil Corporation (Gulf), and the respondent, United Nuclear Corporation (UNC) are two of the named defendants in this action. UNC is being represented by the Santa Fe, New Mexico firm of Bigbee, Stephenson, Carpenter & Crout (Bigbee), which had previously performed legal work on behalf of Gulf. Gulf, accordingly, moved to disqualify the Bigbee firm.

The history of the relationship between Gulf and Bigbee had its origin in 1968, when substantial reserves of uranium ore were discovered on tracts of land located near Grant, New Mexico. By 1971 Gulf owned a substantial majority interest in a joint venture which had acquired a portion,

* Senior Circuit Judge John Minor Wisdom, of the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

designated as the Mt. Taylor properties, of these uranium reserves. After having acquired its interests, Gulf retained the Bigbee firm to represent it on legal matters relating to Gulf's uranium operations in New Mexico. During a five year period of representation from 1971 through 1976, the Bigbee firm through nine of its twelve attorneys performed numerous services for Gulf including the patenting of fifty-nine mining claims, drafting leases required for uranium exploration, representing Gulf in litigation involving title disputes, counseling Gulf in relation to the resolution of certain problems relating to mine waters, and lobbying on behalf of Gulf in front of the New Mexico state legislature on tax and environmental matters. One of Bigbee's name partners, G. Stanley Crout, alone spent over 2,000 hours working on behalf of Gulf.

Gulf argued before the district court that these matters on which Bigbee represented Gulf were substantially related to the matters raised in the Westinghouse litigation. Gulf delineated this relationship by arguing that since the Mt. Taylor properties constituted Gulf's largest supply of uranium and was not currently in production, the reasons for Gulf's failure to produce from this property would be material to the allegation of the Westinghouse suit that Gulf, as well as the other defendants, withheld uranium supplies from the market. Further, Gulf argued, in relation to Bigbee's prior representation of Gulf, Gulf had entrusted Bigbee with confidential information relating to the quantity and quality of uranium reserves in the Mt. Taylor properties. Finally, even though Bigbee represented UNC, a co-defendant in Westinghouse, the position between the two parties was adverse because UNC was attempting to exculpate itself by inculpating Gulf.

The district court accepted Gulf's argument of actual adverseness but nonetheless declined to disqualify the Bigbee firm. The court concluded that Bigbee "certainly did gain knowledge of Gulf's uranium properties during its work" but reasoned that nevertheless there was not a substantial relationship between the matters encompassed by the prior representation and those of the Westinghouse litigation, because the prior representation "focused on real estate transactions connected with Gulf's untapped and undeveloped uranium reserves," whereas the "heart of the complaint" details a price-fixing conspiracy, the evidence of which "will focus on meetings and communications among the alleged co-conspirators, as well as evidence on uranium prices, terms and conditions of sale, and market availability." Thus, the court concluded that there was no substantial relationship between the matters. *Westinghouse Electric Corp. v. Rio Algom Ltd.*, 448 F.Supp. 1284, 1312 (N.D.Ill.1978).

## II

■ The district court set out and attempted to apply what is clearly settled as the relevant test in disqualification matters: where an attorney represents a party in a matter in which the adverse party is that attorney's former client, the attorney will be disqualified if the subject matter of the two representations are "substantially related."

The substantial relationship test had its federal court genesis in *T. C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F.Supp. 265, 268 (S.D.N.Y.1953). The Second Circuit continues to apply the test. *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2d Cir. 1978); *NCK Organization Ltd. v. Bregman*, 542 F.2d 128, 132 (2d Cir. 1976); *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976). That circuit has also developed the "peripheral representation" exception.[1]

---

1. New York City has naturally fostered frequent situations where a single associate lawyer, in transferring from one large firm representing one side of a controversy to another large firm representing the other side, would attract disqualification motions. In *Silver*

*Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 756–57 (2d Cir. 1975), Judge Moore said:

But there is reason to differentiate for disqualification purposes between lawyers who became heavily involved in the facts of a

This circuit has also adopted the substantial relationship test. *Cannon v. U. S. Acoustics Corp.*, 398 F.Supp. 209, 223–34 (N.D.Ill.1975), *adopted and affirmed*, 532 F.2d 1118, 1119 (7th Cir. 1976); *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d 706, 710 (7th Cir. 1976); *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1322 (7th Cir. 1978).

The substantial relationship rule embodies the substance of Canons 4 and 9 of the A.B.A. Code of Professional Responsibility.[2] Canon 4 provides that "a lawyer should preserve the confidences and secrets of a client," and Canon 9 provides that "a lawyer should avoid even the appearance of professional impropriety." As a result it is clear that the determination of whether there is a substantial relationship turns on the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the subsequent matter in which disqualification is sought. The rule thus does not necessarily involve any inquiry into the imponderables involved in the degree of relationship between the two matters but instead involves a realistic appraisal of the possibility that confidences had been disclosed in the one matter which will be harmful to the client in the other. The effect of the Canons is necessarily to restrict the inquiry to the possibility of disclosure; it is not appropriate for the court to inquire into whether actual confidences were disclosed.[3]

The substantial relationship test is not a rule of substantive law but a measure of the quantum of evidence required for proof of the existence of the professional obligation. *Consolidated Theatres, Inc. v. Warner Bros. Circuit Management Corp.*, 216 F.2d 920, 924 (2d Cir. 1954). The evidence need only establish the scope of the legal representation and not the actual receipt of the allegedly relevant confidential information. Then only where it is clearly discernible, "that the issues involved in a current case do not relate to matters in which the attorney formerly represented the adverse party will the attorney's present representation be treated as measuring up to the standard of legal ethics." *Fleischer v. A. A. P., Inc.*, 163 F.Supp. 548,

particular matter and those who enter[ed] briefly on the periphery for a limited and specific purpose relating solely to legal questions. In large firms at least, the former are normally the more seasoned lawyers and the latter the more junior. This is not to say that young attorneys in large firms never become important figures in certain matters but merely to recognize that some of their work is often of a far more limited variety. Under the latter circumstances the attorney's role cannot be considered "representation" within the meaning of *T. C. Theatre Corp.* and *Emle* [*Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973)] so as to require disqualification.

2. *T. C. Theatre* was decided in 1953 and many years later in 1969 the final draft of the A.B.A. Code of Professional Responsibility was formulated. "Appearance of impropriety" was not formally embodied in the previous Canons of Professional Ethics and "it was not until the adoption of Canon 9 of the Code of Professional Responsibility that the canons of ethics expressly enunciated that doctrine." *General Motors Corp. v. City of New York*, 501 F.2d 639, 649, n.19 (2d Cir. 1974). As Judge Marshall said in the *Cannon* case, "even if defendants had been unable to persuade the court that there was a substantial relationship, Cannon's representation was so lengthy and pervasive

that he would have to be disqualified under Canon 9." 398 F.Supp. at 228–29. *See also* Grueneberg, *Ethical Considerations When an Attorney Opposes a Former Client: The Need for a Realistic Application of Canon Nine*, 52 Chicago-Kent L.Rev. 525 (1975).

3. In addition, such an inquiry should be avoided whenever a presumption can be utilized due to the unsatisfactory nature of the potential evidence. This inquiry might for example consist of the questionable reliance on *ex parte* representations made *in camera* by the party seeking disqualification as to communicated confidences. Further, as the court in *T. C. Theatre Corp.*, stated:

To compel the client to show, in addition to establishing that the subject of the present adverse representation is related to the former, the actual confidential matters previously entrusted to the attorney and their possible value to the present client would tear aside the protective cloak drawn about the lawyer-client relationship. For the Court to probe further and sift the confidences in fact revealed would require the disclosure of the very matters intended to be protected by the rule.

113 F.Supp. at 269.

553 (S.D.N.Y.1958). Doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification. *International Business Machines Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978); *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975); *Chugach Electric Association v. United States District Court*, 370 F.2d 441, 444 (9th Cir. 1966), *cert. denied*, 389 U.S. 820, 88 S.Ct. 40, 19 L.Ed.2d 71 (1967).

■ In Judge Marshall's opinion in *Cannon*, adopted and affirmed by us, he paraphrased the *T. C. Theatre* formulation that substantial relationship "is determined by asking whether it could reasonably be said that during the former representation [that] attorney might have acquired information related to the subject matter of the subsequent representation." 398 F.Supp. at 223. The opinion in *T. C. Theatre* continued "[i]f so, then the relationship between the two matters is sufficiently close to bring the later representation within the prohibition of . . . [the canons]." 113 F.Supp. at 269. Essentially then, disqualification questions require three levels of inquiry. Initially, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Finally, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

■ Although the district court properly identified this rule of law, it erred in its application. First, we accept Judge Marshall's factual reconstruction of the scope of Bigbee's prior representation. It was established that Bigbee prepared numerous mining patents and handled real estate transactions relating to Gulf uranium properties. Given this reconstruction, the second step in the analysis is to inquire whether it is reasonable to presume that Gulf would have transmitted to the Bigbee firm the class of confidential information allegedly given.

Gulf alleges that three types of confidential information were imparted: 1) that relating to the quantity and quality of uranium reserves at Mt. Taylor, 2) the reasons for delaying the production of those reserves, and 3) information detailing Gulf's relationship with one of the joint owners of the properties. Regardless of the reasonableness of inferring knowledge of the reasons for production delay from the scope of the former representation, we think it is clearly reasonable to presume that the information regarding quantity and quality of uranium was given. Indeed, it seems difficult to believe that Bigbee would not have acquired rather detailed information relating to the quantity and quality of the uranium reserves in the course of its filing of mining patents and resolution of conflicting claims.[4] Judge Marshall concluded that the firm "did gain knowledge of Gulf's uranium properties during its work." 448 F.Supp. at 1312.

Having established the presumption that this information was given, disqualification must result if that information is relevant

---

**4.** To obtain a mining patent the applicant must establish the mineral character of the land to be patented. The applicable test of mineral character is what is known as the marketability test: the deposits must be of such a quantity and quality as would justify a person of ordinary prudence in further expenditure of time and money in an effort to develop a paying mine. *See Cameron v. United States*, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659 (1920). Obviously this can often involve a precise inquiry into the nature of the deposit to be patented. The inquiry in *Barton v. Morton*, 498 F.2d 288 (9th Cir.), *cert. denied*, 419 U.S. 1021, 95 S.Ct.

497, 42 L.Ed.2d 295 (1974), is a good example of this. There the court made extensive inquiries into the extent, composition and value of spotty and unevenly mineralized veins containing some gold, silver and base metals. Clearly, therefore, an attorney filing patent applications must be supplied by the client with all information on the quality and extent of the claim so that he can make a precise determination of the minimum that must be disclosed in the patent application, thereby assuring patentability without compromising the client's interest in keeping this information confidential in order to aid further exploration.

to the issues in the suit pending against Gulf. Relevance must be gauged by the violations alleged in the complaint and assessment of the evidence useful in establishing those allegations. Judge Marshall did not consider the information allegedly given to Bigbee to be relevant to the cartel litigation. He reasoned that the violation charged was essentially price fixing, not conspiratorial control of uranium production. Further, he concluded that the price-fixing charge would be proven by evidence of "meetings and communications among the alleged co-conspirators, as well as evidence on uranium prices, terms and conditions of sale, and market availability." 448 F.Supp. at 1312.

The lower court erred, both in identifying the issues raised by an allegation of price fixing, and in assessing the relevance of circumstantial economic evidence to proof of a price fixing conspiracy. The lower court found that the "heart of the [Westinghouse] complaint is directed at alleged price-fixing arrangements." 448 F.Supp. at 1312. However, an agreement to restrict the production of uranium unquestionably is a price fixing arrangement. "Price fixing" is a characterization which extends to all conspiracies designed to manipulate the price of goods. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *National Macaroni Manufacturer's Association v. FTC*, 345 F.2d 421 (7th Cir. 1965). In fact, all serious attempts to establish a supracompetitive price must necessarily include an agreement to restrict output. Otherwise the monopoly price could never be maintained. Thus, the lower court's view that conspiracy to fix prices and conspiracy to restrict output are distinct offenses is in error. The lower court's reliance on the fact that the complaint contains only a "few scanty references to the alleged conspiratorial control of uranium production" is misplaced.[5] 448 F.Supp. at 1312. Westinghouse's general

allegation of price fixing is sufficient to make evidence tending to establish a conspiracy to restrict uranium production relevant to the litigation.

The lower court also erred in its determination of what evidence was relevant to proof of the alleged price fixing conspiracy. The judge found that evidence of Gulf's quantity and quality of uranium reserves was not sufficiently relevant, reasoning that the conspiracy would be proven through direct evidence of agreement among the conspirators. Relevance, however, must be measured against the potential avenues of proof and not against the expected. Price fixing can be established by direct evidence of agreement or through circumstantial evidence of conduct. *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). If sufficient evidence is obtained to prove the existence of an agreement to fix prices directly, it is true that information revealing the quantity and quality of Gulf uranium reserves would not ever be needed. but Westinghouse need not establish the charged violation by this course.

Most price fixing conspiracies are established through circumstantial evidence. Proof that Gulf was restricting its output of uranium would be highly relevant circumstantial evidence if its competitors were behaving in a parallel fashion. Although evidence of parallel behavior alone may not be sufficient to establish conspiracy, it is given great weight. Furthermore, it has been suggested that proof that an individual competitor has un-utilized productive capacity in excess of demand may in itself suggest collusive behavior within an industry. *See* Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach*, 21 Stanford L.Rev. 1563, 1579–80 (1969). Information possibly demonstrating that Gulf

---

5. The district court cites only a portion of the complaint's references to the constraint issue, *e. g.*, paragraphs 36, 39(b) and 46. The complaint (R. 2–47) also raises the issue twice in the introduction as well as in paragraphs 41(d),

48 and 55(a). Further, Westinghouse continued to raise supply-curtailment issues in the course of the litigation in its answer to interrogatories.

had uranium reserves available for production which were not brought on to the market would be central to this mode of proof. Thus, even though Westinghouse could prove its claim of price fixing solely through direct evidence of collusive agreements, evidence of Gulf's quantity and quality of uranium reserves could serve as a central element in an alternative method of proof of the Section One Sherman Act violation alleged. Certainly the complaint would not prevent Westinghouse from establishing the restraint of trade through use of this inferential economic evidence. Therefore the incentives to disclose and abuse the confidential information are present, and disqualification is required.

In one of the most recent Second Circuit cases, a lawyer upon graduation from law school became associated with a firm representing Cook Industries, which was being sued in connection with a shipment of soybeans from Louisiana to Taiwan which was 254 tons short of the amount stated on the bills of lading and weight certificates. After putting in more than 100 hours over three years on behalf of Cook, the young lawyer left his firm and became associated with another firm where he was assigned to represent the government of India which was suing Cook Industries for delivery of grain of inferior quality and grade and of short weight. Although the two representations involved different shipments at different times to different parties, they shared similar loading and weighing procedures of Cook to which the lawyer had become privy in his first representation. The Second Circuit concluded that "[i]t would be difficult to think of a closer nexus between issues." *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir. 1978).

Here it could reasonably be said that during the former representation the attorneys might have acquired information related to the subject matter of the subsequent representation, that the former representation was lengthy and pervasive, that the former representation was more than peripheral, and that the relationship between the two matters is sufficiently close to bring the later representation within the prohibition of the canons. Therefore there was clearly a substantial relationship between the two representations.

III

■ Given the conclusion that the Bigbee firm's prior work for Gulf was sufficiently related to issues raised in the present litigation, it is necessary to address UNC's argument that Gulf waived any right it might have had to seek disqualification. Although this issue was not addressed by the district court, we hold that, even accepting completely UNC's account of the facts supporting waiver, these facts are legally insufficient to demonstrate a waiver that would prevent disqualification in the present case.

UNC now claims that in 1971, as Gulf began development of its New Mexico properties and sought to retain the Bigbee firm, Gulf was informed that the Bigbee firm had a prior relationship with UNC, which like Gulf was involved in the mining of uranium. UNC further claims that Bigbee informed Gulf that due to this relationship the Bigbee firm could only represent Gulf if Gulf consented that should a conflict arise between Gulf and UNC, Bigbee would not be precluded from representing UNC. Although this forms the basis of UNC's argument of waiver, it also argues that the waiver was subsequently reaffirmed by Gulf on two other occasions. First, in 1973, when Gulf sought to acquire mining lands to which UNC asserted adverse interests, the Bigbee firm refused to review on behalf of Gulf titles to these lands until after UNC withdrew its adverse claims. This, UNC has argued, served as "a forceful reminder to Gulf that the Bigbee firm represented United Nuclear and that it would continue to do so in the event of conflict." Second, in 1975, UNC filed suit against Gulf and a Gulf subsidiary based on matters arising out of an agreement between Gulf, the subsidiary and UNC to engage in a joint venture involving the production of nuclear fuel. The suit alleged that Gulf had fraud-

ulently induced UNC to accept certain terms of this agreement which were to UNC's ultimate detriment and had intentionally mismanaged the corporation formed by this agreement. These actions were alleged to have been for the purpose of eliminating UNC as a competitor in the nuclear fuel market and thereby to have violated New Mexico's antitrust laws. According to UNC, Gulf had been notified in advance of the filing of this suit and had consented to their representation of UNC in that matter. This, UNC urges, served as yet another "forceful reminder" of Gulf's second-class status as a Bigbee client.[6]

Ultimately UNC's waiver argument depends on the underlying proposition that a client would, or even may, authorize an attorney to utilize against him information given to the attorney in confidence.

As we noted earlier, disqualification in this case is required by the application of Canon 4. The Ethical Considerations set out in Canon 4 address the effect of client consent to the release of confidential information. EC 4–2 sets out the general conditions under which confidential information may be disclosed:

The obligation to protect confidences and secrets obviously does not preclude a lawyer from revealing information when his client consents after full disclosure, when necessary to perform his professional employment, when permitted by Disciplinary Rules, or when required by law.

The Ethical Considerations then detail the conditions for disclosure in specific instances, e. g., "in the absence of consent of his client after full disclosure, a lawyer should not associate another lawyer in the handling of a matter . . ." EC 4–2. Of particular relevance is the following passage:

A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except

with the consent of the client after full disclosure, such information for his own purposes.

EC 4–5. We believe it significant that the language of this ethical consideration is carefully constructed so that the consent clause only applies to the portion of the sentence dealing with the lawyer's personal use of confidential information. The omission of this phrase from the first half of the sentence leads to the conclusion that a client's consent will not justify the use of confidential information against the client.

The policy behind the refusal to permit consent to serve as a justification for the use of confidential information against a client is well set out in *In re Boone*, 83 F. 944 (D.C.N.D.Cal.1897). There the attorney had sought to be retained by a defendant in a prior action in which the attorney had represented the plaintiff. The attorney sought this retainer by representing that he had obtained information from his former client that conclusively proved that the judgment that had been enforced in the prior action had been fraudulently obtained. The attorney justified this action on the basis of a written release from the former client which stated that the client "releases said Boone [the attorney] from all rights, burdens, obligations, and privileges which appertain to his said employment, and consents that said Boone may engage his services pro and con, as he may see fit." 83 F. at 955. The court refused to accept this consent as a defense to the disclosure of confidential information, noting

that he [the former client] would thus willingly and freely consent, apparently without the slightest objection or hesitancy, to furnish his adversaries in this very same litigation with weapons with which to contest, and, possibly defeat, his valuable rights . . . is . . . almost unworthy of credence. . . . Ordinary experience teaches us that men endowed with the ordinary business sense

---

**6.** Gulf disputes many of the details of UNC's account of the alleged waiver, in particular with regard to its consent to the Bigbee firm's participation in the New Mexico action. Since,

however, we do not find even UNC's account of waiver itself to constitute a legally sufficient basis for waiver, it is not necessary for us to address the veracity of the account.

and experience do not enter into such remarkable and prejudicial engagements. 83 F. at 956.

■ UNC's efforts in this case to cite authority for its contention that consent will preclude disqualification of the Bigbee firm fail to take into account the numerous bases upon which disqualification may be premised. For example, disqualification may be sought under Canon 5, which requires that a lawyer "exercise independent professional judgment on behalf of a client." The principle enunciated in this canon may require disqualification where a lawyer is concurrently representing adverse clients even if the subject matters of the representations are completely disjunct.[7] Such disqualification would be premised upon the possibility that pre-existing loyalties to one client may cause him, the attorney, to temper his representation of the other. Certainly in these instances the consent of the clients to the mutual representation will preclude disqualification since the clients are in an adequate position to judge the effects of the divided loyalties and may indeed determine this effect to be so minimal as to obviate any fears of inadequate representation.[8]

Disqualification based on the potential for abuse of confidential information, however, involves different considerations which preclude the effectiveness of consent, particularly a vague, general consent given or implied prior to the threat of disclosure or adverse litigation. In that instance it is impossible to conclude that a client could ever have any reason to desire that information disclosed in confidence should be utilized against him.[9] In other words consent to the mere representation of a client with adverse interests does not amount to either consent to breach of confidential disclosure or to the use of that information against the consenting party in litigation. Accordingly, we hold that a simple consent by a client to representation of an adverse party is not a defense to that former client's motion for disqualification, such as the one under review here, based on the possibility that confidential information will be used against the former client.

The district court is reversed and the motion of Gulf Oil Corporation to disqualify Bigbee, Stephenson, Carpenter & Crout from representing United Nuclear Corporation in *Westinghouse Electric Corporation v. Rio Algom Limited, et al.,* is granted.

**REVERSED AND REMANDED.**

7. *See e. g., IBM Corp. v. Levin,* 579 F.2d 271 (3d Cir. 1978), in which the court disqualified counsel for plaintiff in an antitrust suit against IBM where the disqualified attorney had been representing IBM on labor matters when the suit was filed. There was no contention that the matters of representation were related.

8. Indeed, most of the circuit court cases cited by UNC as support for the efficacy of consent involve disqualification motions under the divided loyalty theory of Canon 5 and not the breach of confidence theory of Canon 4. *See, e. g., Whiting Corp. v. White Machinery Corp.,* 567 F.2d 713 (7th Cir. 1977); *Central Milk Producers Cooperative v. Sentry Food Stores, Inc.,* 573 F.2d 988 (8th Cir. 1978); *United States v. Garcia,* 517 F.2d 272 (5th Cir. 1975). The other circuit court cased cited by respondents, *In re Yarn Processing Patent Validity Litigation,* 530 F.2d 83 (5th Cir. 1976), is similarly inapposite. The consent referred to in that case involved the continuing consent of a former client who was not seeking disqualification of the opposing counsel. Such continuing consent obviously indicates, as the court stated, that the client believes that there is no confidential information in the possession of the attorney which could be used to his detriment. This is clearly distinguishable from instances in which the former client is objecting and the attorney seeks to claim that the client previously consented to this detrimental use of confidences.

9. Of course, this is not to say that a client may not consent to *any* disclosure of confidential information. Certainly he may, for example, desire to permit public release of certain confidential information or release of the information to other attorneys, witnesses or parties assisting in his case. *See* EC 4–2, 4–3. We are only holding that clients will not be deemed to have consented to the use of confidential information in subsequent litigation against them.