# Application of Conflict of Interest Rules to the Conduct of Government Litigation by Private Attorneys

Whether the American Bar Association's Code of Professional Responsibility would bar private attorneys, retained as contractors to represent the interests of the United States in railroad litigation, from simultaneously representing other parties whose interests are adverse to those of the United States, depends on the facts of each situation.

Ethical constraints on private attorneys retained to conduct railroad litigation on behalf of the United States do not end with the termination of the railroad litigation itself.

The making of litigation judgments is a function at the core of the President's Article II duty to take care that the laws be faithfully executed, and must, therefore, be performed by those who serve under, and are responsible ultimately to, the President.

The scope of ethical restraints on private attorneys retained by the United States depends upon extent of necessary interaction with and supervision by government officials; if close interaction and supervision can be anticipated, likelihood of ethical problems developing increases.

Appendix identifies and discusses issues under the conflict of interest laws applicable to the temporary appointment of an attorney in private practice as a government attorney.

February 22, 1980

## MEMORANDUM OPINION FOR THE SPECIAL ASSISTANT TO THE ATTORNEY GENERAL

This responds to your request for our discussion of the possible application of the American Bar Association's Code of Professional Responsibility (ABA Code) to a transfer of litigation from the United States Railway Association (USRA) to a department or agency, such as the Department of Justice. This issue has arisen in the course of this Department's preparation of a feasibility study for Congress on the transfer of USRA's litigation to an agency of the government. This Office has written two earlier memoranda that bear on that subject.[1] At this time, you have requested our discussion of the following question. Assuming that USRA is abolished and its litigation were transferred

---

[1] One memorandum dealt directly with the issue of possibly transferring USRA's litigation to the Department of Justice. *See* memorandum of April 11, 1979, for the Deputy Associate Attorney General, "Possibility of Transferring the Litigating Functions of the United States Railway Association to the Department of Justice." A second memorandum discussed at a general level the application of conflict of interest statutes and principles to the conduct of government litigation by private counsel. *See* memorandum of March 23, 1979, for the Deputy Associate Attorney General, "Questions Raised by Proposed Appointment of Lawyer in Private Practice as a Government Attorney for Purposes of Trying Selected Civil Cases." [Note: The March 23, 1979, memorandum is published as an appendix to this opinion at p. 441, *infra.* Ed.]

434

pursuant to statute to the Department of Justice, and assuming that the Department received authority to hire private attorneys as contractors to represent the interests of the United States in litigation,[2] would the Code bar such private attorneys from simultaneously representing in other litigation corporations or other parties whose interests are adverse to those of the United States?

We should stress at the outset that the application of the ABA Code in this situation, as in others, depends on the particular facts of each case. Of crucial importance, of course, is the nature of the representation which the private attorneys may seek to undertake or have already undertaken. These facts are, in the first instance, peculiarly within the knowledge of the private attorneys. Therefore, in this discussion we can only identify the general principles that would apply in a particular case.

Three of the ABA Code's canons of ethics may bear on a situation in which a private attorney is to be engaged as an independent contractor of the Department to conduct railroad litigation. Canon 4 provides that a lawyer should preserve the confidences and secrets of a client learned while representing the client. Canon 5 establishes that a lawyer should exercise independent professional judgment on behalf of a client. In particular, such judgment should be exercised "solely for the benefit of [the] client and free of compromising influences and loyalties." Ethical Consideration 5-1. Canon 9 directs that a lawyer should avoid even the appearance of professional impropriety. We will focus here on Canon 5. It states explicitly the principle that is most directly relevant to your question, namely, that an attorney should not compromise his independent professional judgment by "serving two masters" and is obligated to represent each client with undivided loyalty.

The applicable disciplinary rule, DR 5-105, reads as follows:

> (A)  A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5-105(C).

---

[2] We believe that under existing statutes the Attorney General would not have such authority. The issues surrounding the authority of the Attorney General to hire counsel outside the Department, and the Attorney General's duty to supervise litigation involving the interests of the United States, are discussed in our April 11, 1979, memorandum for the Deputy Associate Attorney General.

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(D) If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.

The foregoing rule establishes a two-part analysis for determining whether, in a particular case, an exception may be made to the principle that a lawyer should not represent multiple clients with "differing interests":[3] (1) it must be "obvious" that the lawyer can "adequately" represent each client's interest, and (2) each client must consent to the representation after full disclosure of the facts. This two-part analysis is also reflected in the proposed rules of professional conduct, not yet adopted by the ABA, which were circulated at the ABA mid-winter meeting in a discussion draft dated January 30, 1980. That draft enunciates the basic principle that "a lawyer may not act as advocate against a person the lawyer represents in some other matter, even if the litigation is wholly unrelated." (*Id.* at p. 29.) The draft goes on to say, however, that ". . . there are circumstances in which a lawyer may act as advocate against a client. For example, a lawyer engaged in a suit against a large corporation with diverse operations may accept employment by the corporation in an unrelated matter if doing so will not affect the lawyer's conduct of the suit and if both the litigant and the corporation consent upon adequate disclosure." (*Id.*) Accordingly, the proposed ethical rules maintain both the requirement that dual representation would "not affect the lawyer's conduct of the suit" and, thus,

---

[3] The phrase, "differing interests," is defined rather broadly in the ABA Code. It includes "every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest."

that the lawyer can adequately represent the client's interests *and* the requirement that each client must consent to such representation.

The principles of Canon 5 would apply to the government's independent contractor that sought simultaneously to represent both the United States, and in other litigation another party with interests adverse to those of the United States. In such a situation, a court will consider not just whether the two matters as to which simultaneous representation is to be undertaken are substantially related, but also whether "the duty of undivided loyalty which an attorney owes to each of his clients" may be discharged. *Cinema 5, Ltd.* v. *Cinerama, Inc.,* 528 F.2d 1384, 1385-87 (2d Cir. 1976). At a minimum, a court would normally expect that participation in a lawsuit against a client, or similar adverse representation, had been fully disclosed to and consented to by all concerned clients. *See id.* at 1386; *see also IBM* v. *Levin,* 579 F.2d 271, 280 (3d Cir. 1978) (an attorney "must resolve all doubts in favor of full disclosure to a client of the facts of the attorney's concurrent representation of another client in a lawsuit against him."). Moreover, a court may well take an independent look at the underlying facts of the dual representation. As the Court of Appeals for the Second Circuit has written:

> Where the relationship is a continuing one, adverse representation is prima facie improper . . . and the attorney must be prepared to show, at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation.[4]

In view of these principles, as a practical matter two different steps would have to be taken in the present situation. First, before any private firm were retained to represent the United States in the railroad litigation, it would be necessary for the United States to know about cases—involving litigation, counseling or other aspects of representation—that the firm presently has in which the interests of the United States in the railroad litigation would be implicated. Then, each of the cases should be studied in order to determine whether the representation called for by them would make it unlikely that the private attorneys could also represent with undivided loyalty the interests of the United States in the railroad litigation. If agencies or instrumentalities of the United States other than the Department of Justice were involved in the firm's other cases, those agencies should be consulted in determining whether a conflict of interest would arise from engaging the firm in the railroad litigation.

Second, both the United States and the law firm's other present clients would have to agree to its representation of the United States in the railroad litigation. And, whenever the firm sought to engage a new

---

[4] *Cinema 5, Ltd.* v. *Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir. 1976) (emphasis in original).

client in a matter involving the United States, the firm would have an obligation to inform the United States of that fact. In that way, the United States would be able to determine whether it should continue to consent to representation by the private attorneys of its interests in the railroad litigation.

Also, the ethical constraints would not end with the termination of the railroad litigation itself. Even after the attorney-client relationship between private attorneys and the United States ended, the private attorneys would be bound not to reveal confidences of the United States gained as its lawyer. The "clearly settled test" in disqualification matters where the adverse party is the attorney's former client is the so-called "substantial relationship" test: ". . . the attorney will be disqualified if the subject matter of the two representations are 'substantially related.'" *Westinghouse Elec. Corp.* v. *Gulf Oil Corp.*, 588 F.2d 221, 223 (7th Cir. 1978); *see also T.C. & Theatre Corp.* v. *Warner Bros. Pictures, Inc.*, 113 F. Supp. 265, 268 (S.D.N.Y. 1953). This test "embodies the substance of Canons 4 and 9 of the ABA Code of Professional Responsibility," 588 F.2d at 224. It turns on "the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the subsequent matter in which disqualification is sought." *Id.*; *see also Westinghouse Elec. Corp.* v. *Kerr-McGee Corp.*, 580 F.2d 1311, 1322 (7th Cir. 1978).[5]

In addition to the foregoing, we think a word is in order on a related, but somewhat distinct, set of issues. There has always been in this Office a basic question whether it is appropriate for the Attorney General (or the President) to contract out the litigation responsibility of the United States. The question has both a constitutional and a policy aspect. First, on the constitutional level, we have long asserted that the making of litigation judgments (variously described as prosecutorial discretion or litigation management) is a function at the core of the President's Article II duty to take care that the laws be faithfully executed, and must, therefore, be performed by those who serve under, and are responsible ultimately to, the President. Second, on the policy level, we have enunciated the view that the performance of this function is best assured by centralizing all litigation in one agency under one Cabinet official. We have long defended the essentiality of Attorney General "supervision" and "control" of litigation involving the United States.

Of course, at the same time, this Department has often acknowledged the merit—or at least the tolerability—of allowing the independent regulatory commissions and government chartered corporations to

---

[5] A number of steps should also be taken by a law firm during the course of representing the United States to protect any confidences gained during that representation from other attorneys in the firm who may be involved in cases involving the United States, such as assuring that the files of the railroad case will only be accessible to certain attorneys and those attorneys will have no contacts with others in the firm with respect to other cases involving the United States.

retain independent litigating authority. (Indeed, USRA was one of these independent entities.) Our acceptance of that independence has grown out of an appreciation of the rather distinct nature of these entities; they were created by Congress to function to some extent beyond the control of the President. As long as their functions are not controllable in the normal manner by the Executive Branch, it makes at least reasonably good sense to allow their litigation judgments to go forward outside the President's and the Attorney General's control. However, the abolition of the independent entity and its incorporation into the structure of the Executive Branch would remove the only legitimate traditional reason for independent litigation responsibility.

If the USRA is to be no longer a party to the litigation, and if the United States is to be the only party having an interest in the outcome of the pending valuation cases, our knee jerk response ordinarily would be that there is no cause for having lawyers other than those supervised by the Attorney General making the litigation judgments and arguing the United States' cause in court. The question you have posed as an ethical issue has, candidly, given us considerable concern because it involves a proposal that is alien to our experience and contrary to this Department's usual stance on questions of litigation supervision. How can a lawyer represent the United States in court if he or she is not accountable to the United States? How can that lawyer divine whether the position he or she intends to take in court—both on questions of procedure and substance—is the view of the United States? At the least, unless there is central supervisory authority, the positions taken in these cases could only reflect the position of the United States *in these cases* and not in other cases litigated by this Department.

Our study of the ethical question you posed has led us to the view that the ethical inquiry inevitably merges with these overarching questions of policy. They merge for this reason: The extent to which a private lawyer or firm can both represent the United States and litigate against it may depend upon the extent to which the work done on behalf of the United States can take place in a sterile environment removed from the usual exchange of information and personal interchange that characterizes our litigation practice. That is, if the representational activity could be performed without consultation and exchange within this Department, it might be fairly easy to conclude that there is less reason to believe that client confidences will be misused or that loyalty will be undercut. The fully *independent* contractor probably fits well within that structure. Such a contractor would receive an assignment and carry it out without further input or second-guessing by the Department. Thus, if we were to retain a law firm to perform a study on behalf of the Department, the performance of that segregable activity would probably not jeopardize the firm's ability to litigate against this Department in cases unrelated to that subject matter.

439

The question that we find especially troubling here is whether that same firm can, realistically and consistently with our traditional understanding of the role of this Department, undertake a contract to litigate on behalf of the United States that will not force it to interact closely with this Department. If the answer is that interaction and supervision are to be anticipated, then to that extent the likelihood of ethical problems correspondingly increases. In this same vein, one additional point should be reemphasized. It will not suffice for this Department alone to make the judgments whether ethical problems appear in other cases in which the lawyer or firm may be involved. In those cases the views of our client agencies will have to be seriously evaluated, and we see no way in advance of consultation with those agencies that this Department can pass on whether disqualification would be required in some other cases.

The question you raise is obviously a difficult one, and we would not want our discussion here to suggest that the ethical dilemma presents an insurmountable obstacle. We would be pleased to address this question further as more concrete facts become available.

LARRY A. HAMMOND
*Acting Assistant Attorney General*
*Office of Legal Counsel*

APPENDIX

March 23, 1979

MEMORANDUM OPINION FOR THE DEPUTY ASSOCIATE
ATTORNEY GENERAL

This responds to your request for advice regarding problems that
would be raised under the conflict of interest laws in connection with a
proposed temporary appointment of a lawyer (L) in private practice as
a government attorney for the purpose of trying selected civil cases.
You stated that a number of alternatives are being considered: service
with or without compensation, on a part- or full-time basis, with or
without continuing affiliation with a private firm, for a period of time
of a few months to about two years. In this memorandum we discuss
the principal questions raised by these alternative proposals: (1) whether
the lawyer may be hired as an independent contractor rather than as a
government employee; (2) the compensation he can be paid; (3) the
extent to which his disqualification would be necessary pursuant to 18
U.S.C. § 208; (4) other limitations applicable to the lawyer and his
partners during the lawyer's tenure with the government; (5) restric-
tions on post-employment activities applicable to the lawyer and his
partners; and (6) issues raised under the ABA Code of Professional
Responsibility in connection with the proposed appointment. As you
know, and as our comments in this memorandum demonstrate, the
relevant federal personnel, conflict of interest, and ethical requirements
constitute a formidable body of regulation. In our work in these areas
we have frequently found that there is no reasonable substitute for
careful case-by-case assessments. At the level of generality called for by
your request we can do little more than identify the major consider-
ations and suggest how they have been resolved in the past. We would,
of course, be pleased to elaborate on any of these matters, or to provide
specific advice on any particular arrangements as you may deem
helpful.

### 1. Independent Contractor or Government Employee

Officers and employees in the Executive Branch are covered by the
conflict of interest laws; independent contractors are not. One who in
fact will serve as a government employee may not, however, be hired
as an independent contractor to avoid the application of the conflict of

interest laws. The terms "officer" and "employee" are not defined in the conflict of interest laws themselves. The definitions of these terms provided by §§ 2104 and 2105 of Title 5 are ordinarily referred to for guidance. Three elements are regarded as having critical significance: (1) appointment in the civil service by one of the federal officers or employees specified; (2) performance of a federal function under authority of law or an "executive act";[1] and (3) supervision by a federal official of the performance of the duties of the position.[2] In this case, L would seem plainly to be an employee: he would be formally appointed, would perform services ordinarily performed by Department employees pursuant to 28 U.S.C. § 516,[3] and would be under the supervision of Department officials who would remain responsible for the conduct of the litigation in question.[4] In addition, § 516 of Title 28 reserves to "officers" of the Department of Justice the authority to conduct litigation in which the United States is a party. For both these reasons, we believe L must be appointed as an employee, rather than as an independent contractor.

## 2. Compensation

We assume that L would be employed on a temporary basis either as a Special Assistant United States Attorney pursuant to 28 U.S.C. § 543, or as a special attorney or special assistant to the Attorney General pursuant to 28 U.S.C. § 515(b).[5] If appointed as a Special Assistant

---

[1] The meaning of the phrase "executive act," used in 5 U.S.C. § 2105(a)(2), is unclear. Performance of executive functions would, however, clearly come within the terms of the statute.

[2] The Civil Service Commission has developed a more lengthy list of indicia of employee status: service under the supervision of a federal employee; work in government space with government equipment; access to government files; handling of specific agency problems; service on more than one occasion on the same project; work on dates and hours required to be reported to the agency. *See* Federal Personnel Manual, ch. 304. *See also Lodge 1858, Am. Fed. of Gov't Emp.* v. *Administrator, NASA,* 424 F. Supp. 186 (D.D.C. 1976); B. Manning, *Federal Conflict of Interest Law* 27–34 (1964).

[3] He would not, therefore, qualify as an expert or a consultant whose services may be procured by contract pursuant to 5 U.S.C. § 3109 as authorized by § 4(c), Department of Justice Appropriation Authorization Act, Fiscal Year 1979, Pub. L. No. 95–624, 92 Stat. 3459, 3462.

[4] The Comptroller General has recognized that notwithstanding the general rule that purely personal services must be performed by regular government employees, there may be unusual circumstances where—because of the nature of the work or the existence of conditions not permitting its performance in the usual manner (such as where regular employees are not qualified or are not available)—contracting for personal services may be permitted. Such circumstances exist where, in order to avoid the appearance of conflict of interest, it becomes necessary to retain private counsel to defend a federal employee sued in his individual,·rather than official, capacity in a civil proceeding which arises out of his performance of official duties at the same time that the employee is the target of a criminal investigation concerning the act or acts for which he seeks representation. *See* 28 C.F.R. §§ 50.15, 50.16 (1978). No such unusual circumstances appear to exist in the instant case.

[5] Notwithstanding the existence of this authority, government-wide limitations on hiring may be in effect at the time of the proposed appointment. A general freeze on permanent hiring could continue in effect in order to implement the requirements of § 311(a) of the Civil Service Reform Act of 1978, Public Law No. 95–454, 92 Stat. 1111, 1153, which provides that the total number of federal civilian employees on September 30, 1979, may not exceed the number on September 30, 1977. Temporary hiring may not be used to circumvent such a freeze. *See* OMB Bulletin 79-2, ¶ 3, (October 27, 1978). In addition, it is noteworthy that the employment ceiling on total employees, imposed by OMB on each agency, encompasses temporary employees.

United States Attorney, L's salary would be administratively determined pursuant to 28 U.S.C. § 548. Because of the ceiling now imposed by 5 U.S.C. § 5308, the maximum per diem rate paid Special Assistant United States Attorneys is $182. Since no minimum salary is established by law for such positions, L might also be appointed without compensation should he so desire.[6] If appointed as a special assistant or special attorney, L could be paid an annual salary fixed by the Attorney General at not more than $12,000. 28 U.S.C. § 515(b). We have previously opined that this provision permits compensation at a per diem rate of $\frac{1}{360}$ of $12,000, rather than payment at a greater rate so long as his total compensation for the year does not exceed the $12,000 ceiling. Like § 543, § 515(b) does not establish a minimum salary; service without compensation would thus for similar reasons be permissible.

Whether additional payments may be made by his firm to supplement L's government salary, and the extent to which compensation reflecting his or his partners' earnings unrelated to his government service may be received by him to supplement his government salary, depends on whether L will qualify as a special government employee within the terms of § 202(a) of Title 18. The term "special Government employee" is there defined to include "an officer or employee of the executive or legislative branch of the United States Government, . . . who is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days in any period of three hundred and sixty-five days, temporary duties either on a full-time or intermittent basis." For an individual to be appointed as a special government employee, the Department must in good faith estimate in advance of the appointment that he will serve for no more than 130 days in the 365-day period beginning on the day of his appointment. In estimating the number of days to be served, a part of a day must be counted as a full day, and a Saturday, Sunday, or holiday on which duties are to be performed must be counted equally with a regular work day. Federal Personnel Manual, ch. 735, Appendix C. If an employee does, however, serve for more than 130 days in a 365-day period, he will nevertheless continue to be regarded as a special government employee so long as the original estimate was made in good faith. *Id.* Once an individual is appointed as a special government employee, the restrictions imposed by the conflict of interest laws apply even on days he does not serve the government. *Id.*

Sections 203 and 209 of Title 18 limit the compensation employees may receive in addition to their government salary. Section 209, which prohibits receipt or payment of any salary, contribution to or

---

[6] Section 665(b) of title 31 prohibits the acceptance of "voluntary service." This prohibition was not intended to preclude acceptance of "gratuitous" services rendered in an official capacity under regular appointment otherwise permitted by law to be nonsalaried where an agreement is reached prior to appointment that the employee is to serve without compensation. 30 Op. Att'y Gen. 51 (1913).

supplementation of salary as compensation for an employee's services as an employee of the Executive Branch, is expressly not applicable to special government employees. 18 U.S.C. § 209(c). Section 203 prohibits receipt or payment of any compensation for services rendered or to be rendered either by a special government employee currently employed in the Executive Branch or by "another" (such as his law partner) only in relation to a particular matter involving a specific party or parties in which he has at any time participated personally and substantially as a government employee or which is pending in the department in which he is serving. Moreover, the Department-wide ban applies only where he has served in the Department for at least 61 days during the immediately proceeding 365 days. A special government employee would therefore be free to receive and to share in fees generated by his partners except as to a limited class of matters such as, for example, representation in connection with a criminal investigation that has not yet resulted in an indictment and is therefore still pending in the Department. Section 203 does not, however, bar receipt of fees in relation to representation before the federal courts even though the matter may incidentally be pending in the Department because of the Department's role in the court proceeding.

Broader restrictions on receipt of outside compensation would apply if L does not qualify as a special government employee, i.e., if he would be a regular employee. If L were to serve without compensation, § 209 would still be inapplicable. 18 U.S.C. § 209(c). However, § 203 would prohibit receipt or payment of compensation for any services rendered or to be rendered by another before any department, agency, court-martial, officer, civil, military or naval commission in relation to any particular matter in which the United States is a party or has a direct and substantial interest. L could not, therefore, share in fees for representational services rendered under such circumstances. While he could share in fees received by his partners for services rendered in court,[7] he could not himself act as agent or attorney for anyone in court in connection with any particular matter in which the United States is a party or has a substantial interest.[8] Thus his income would be limited accordingly.[9]

Finally, if L is a regular employee, but does receive compensation from the government for his efforts, he would be subject both to the

_____

[7] He could not, however, receive any gratuity, or any share of or interest in any claim against the United States in consideration of assistance in the prosecution for such claim. 18 U.S.C. § 205(1).

[8] 18 U.S.C. § 205(2).

[9] Department regulations also prohibit private professional practice by other than special government employees. 28 C.F.R. 45.735-9(a) (1978). This requirement has been interpreted to require regular government employees to resign from private practice during their period of government service. The Associate Attorney General may make exceptions to this requirement in unusual circumstances. 28 C.F.R. 45.735(c) (1978). Outside employment that would interfere with the proper performance of an employee's duties, create or appear to create a conflict of interest, or reflect adversely on the Department of Justice, is in any event barred. 28 C.F.R. 45.735-9(d) (1978).

restrictions imposed by § 209 and those imposed by § 203. He thus could not receive supplemental compensation from his firm for performing his government job. And if he were to work for the government on a full-time basis, he would probably be treated by the firm as having gone on a leave of absence from the firm and hence would be barred altogether from sharing in firm profits unless under established firm policy persons having such a status would be entitled to certain compensation regardless of their efforts on behalf of the firm. If L as a regular employee were to work only part-time for the government, an even more knotty problem of accounting would be posed. To satisfy the requirements of § 209, his share in firm profits would have to be reduced to reflect his more limited participation in the firm's business; to satisfy § 203, his share would have to be further reduced in light of his inability to share in fees for representational services performed by another as outlined above.[10] Perhaps the most workable solution to this problem would be for L to receive a salary reflecting the value of services he would render to the firm while working on a part-time basis. Any definite conclusion as to the compensation that might be received in these circumstances must, in any event, be deferred until more specific facts are presented.

### 3. Disqualification Pursuant to Section 208

The feasibility of your proposal may well ultimately turn on the application of § 208 of Title 18 to the facts of each particular case. Section 208 requires an officer or employee (including a special government employee) to disqualify himself from participating in decisions with regard to particular matters where he, his spouse, minor child, partner, organization in which he is serving as officer, director, trustee, partner or employee or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment has a financial interest. So long as L is affiliated with his firm,[11] and the firm, through its representation of certain clients, has a financial interest in decisions he might make in the course of his government service, disqualification would be necessary unless a waiver could be obtained under § 208(b).[12] A waiver is available on an *ad hoc* basis where an employee receives in advance a written determination that the interest is not so substantial as to be deemed likely to affect the integrity of the services which the government may expect from that employee. Decisions in the situation you have described would not,

---

[10] He could, however, continue to participate in bona fide pension, retirement, group life, health, or accident insurance, profit-sharing, stock bonus, or other employee welfare or benefit plans. 18 U.S.C. § 209(b).

[11] A leave of absence is regarded as a continuation of employment within the terms of § 208.

[12] Thus, where his law partner performs a significant amount of work on behalf of client X, L would be required to refrain from participating in a decision that would significantly affect client X's business.

however, appear to fall within this *de minimus* exception at least where clients of a major law firm are involved. Careful consideration would therefore have to be given to the circumstances in which decisions by L in the course of his government employment would affect clients of his firm, and thus, the financial interests of himself or his partners. Although § 208 does not, in terms, prohibit an individual's appointment, if disqualification will frequently be required, the appointment may at the outset be futile.

### 4. Other Restrictions Under the Conflict of Interest Laws Applicable During Government Tenure

a. *Restrictions on L.* We have previously discussed the restrictions on receipt of compensation and on participation in decisions affecting a personal financial interest, and have briefly alluded to the prohibition on certain activities of government employees imposed by § 205. If L is a special government employee who serves for at least 61 days, he will be barred by § 205 from acting as attorney or agent in relation to any particular matter involving a specific party or parties in which he has at any time participated in the course of his government service, or which is pending in the department in which he is serving. He would not otherwise be barred from acting as an attorney in court proceedings or in proceedings before other agencies. If he does not qualify as a special government employee, he must refrain from acting as agent or attorney for anyone before any department, agency, court, court-martial, officer or any civil, military or naval commission in connection with any particular matter in which the United States is a party or has a direct and substantial interest.

b. *Restrictions on L's partners.* L's partners are precluded from acting as agents or attorneys for anyone other than the United States in connection with any judicial proceeding or other particular matter in which the United States is a party or has a direct and substantial interest and in which L participates or has participated personally and substantially as a government employee, or which is under his official responsibility.[13] This bar is only effective during the period in which L serves as a government employee. Thus, if L remains affiliated with his firm, the firm may not, during his tenure with the government, participate as attorney for parties to the litigation in which L is involved. L's partners may not be charged on an imputation theory of wrongdoing in violation of §§ 203 and 205.[14]

---

[13] 18 U.S.C. § 207(c), redesignated as § 207(g), effective July 1, 1979.

[14] The obligations directly imposed on L's partners to observe the prohibitions against providing L with outside compensation are discussed above.

## 5. Post-employment Restrictions

We assume that L, if appointed, will leave government service some time after the July 1 effective date of the recent amendments to § 207 of Title 18. Unless he is designated for coverage under § 207(d),[15] he would not be subject to the aiding and assisting bar of § 207(b)(ii) and the 1-year bar on contacts with the Department under § 207(c). He would, however, be permanently barred from acting as attorney or agent or otherwise representing any person other than the United States in making any communication, with intent to influence, to or in making any formal or informal appearance before any department or court in relation to any particular matter in which the United States or the District of Columbia is a party or has a direct and substantial interest and in which he participated personally and substantially. He would also be prohibited for 2 years from acting as agent or attorney in similar circumstances with regard to matters under his official responsibility during the last year of his government service. In all likelihood, L's realm of official responsibility will be no broader than the matter in which he participates personally and substantially, and he will essentially be barred simply from switching sides in the case in which he served as government counsel and in closely related cases.

Ethical obligations, rather than statutory requirements, are the source of the principal restrictions applicable to L's partners during the post-employment period.

## 6. Ethical Constraints

While we will touch here briefly upon ethical constraints that may be of significance, you should be aware that a general discussion of this sort is of limited value and adequate guidance can only be given where reference can be made to particular facts and circumstances.

a. *Restraints on L's service with the government.* If L or his firm has previously represented any of the defendants in the case he will be trying for the government, he may be subject to a motion to disqualify based on the American Bar Association's Canon 4 directive to preserve the secrets and confidences of a client unless he could demonstrate that he never received confidential information in a case substantially related to the case he handles for the government. Even were the former client to waive such disqualification, a question would be presented whether the United States should accept such a waiver, particularly in a case in which the United States is suing the client, since the govern-

---

[15] Persons paid at the executive level are automatically covered. Those paid at a rate of GS-17 or above who have significant decisionmaking or supervisory responsibility and others in positions with comparable decisionmaking authority are to be designated for coverage by the Director of the Office of Government Ethics.

ment should be above reproach and should avoid even the appearance of impropriety.

b. *Restraints on L's firm following his service with the government.* Following his government service, L would be obliged, pursuant to DR 9-101(B) of the ABA Code of Professional Responsibility, to decline private employment in a matter in which he had substantial responsibility while he was a public employee. His disqualification would also be imputed to his firm pursuant to DR 5-105(D) of the ABA Code of Professional Responsibility. This Department has taken the position, approved in ABA Formal Opinion 342, that the disqualification of a firm may be waived by the government whenever effective screening measures by the firm will effectively isolate the lawyer who is personally barred from participating in the particular matter and sharing in the fees attributable to it, so long as there is no appearance of significant impropriety affecting the interests of the government.[16]

### 7. Conclusions

The above discussion has necessarily been rather general in nature. Should you determine that as a policy matter appointment of L would be appropriate, a more detailed review of the conflict of interest problems likely to be presented would certainly be advisable. For present purposes, however, the following conclusions are perhaps the most significant.

a. L could be appointed as a Special Assistant United States Attorney to be paid at a per diem rate of up to $182. If he is appointed as a special government employee or serves without compensation, his firm may supplement his salary.

b. For L to qualify as a special government employee the Department would be required to estimate in good faith that he would serve the government on no more than 130 out of the 365 consecutive days beginning with the day of his appointment. Days on which only part of his time was devoted to government service would count as days worked for purposes of this estimate.

c. Unless L qualifies as a special government employee, he may as a regular employee be required significantly to limit his activities in private practice pursuant to 18 U.S.C. §§ 203 and 205.

d. Depending on the facts of the case on which L will be working and the clients of the firm with which he is affiliated, L may be seriously handicapped in his performance of his governmental duties because of his obligation under § 208 to refrain from participating in decisions with regard to a matter in which he or his partners have a financial interest or in which his law firm has a financial interest

---

[16] The currently pending proposal for revision of the District of Columbia Bar's Code of Professional Responsibility also addresses this question.

448

because of it representation of a party in the matter. If so, he should probably not be appointed.

e. L may not subsequently serve as agent or attorney in a particular matter in which he personally and substantially participated while in the government.

f. During L's tenure with the government, L's partners are barred from serving as attorneys in a particular matter in which L participates personally and substantially. Following his return to private practice, their obligations would be ethical in nature.

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
