Ruby E. Harris & another[1] vs. Richard A. Magri.

No. 93-P-1643.

Suffolk. February 9, 1995. - October 27, 1995.

Present: Armstrong, Jacobs, & Greenberg, JJ.

*Attorney at Law*, Attorney-client relationship, Malpractice, Negligence. *Contract*, Performance and breach, Attorney, Implied contract. *Evidence*, Expert opinion.

In an action alleging legal malpractice there was insufficient evidence to support the plaintiffs' claim for breach of an implied contract, and the record contained no evidence to support an inference that the harm that befell the plaintiffs was a consequence of any breach of contract by the defendant: the defendant's motion for a directed verdict should have been allowed. [352-354]

Civil action commenced in the Superior Court Department on June 3, 1991.

The case was tried before *Elizabeth B. Donovan*, J.

*David C. Campbell* for the defendant.

*Thomas Philip Degnon* for Ruby E. Harris.

Jacobs, J. A Superior Court jury awarded the plaintiffs $45,000 on their contract claim against the defendant, an attorney. In his appeal from the ensuing judgment, the defendant primarily argues that there was insufficient evidence of breach of contract to survive his motion for a directed verdict made at the conclusion of the evidence.[2] We agree with his contention and reverse the judgment.

[1]The other plaintiff, Abel Harris, Sr., died prior to the trial.

[2]The case properly was submitted to the jury in accordance with the preferred practice. See *Thorson* v. *Mandell*, 402 Mass. 744, 747 n.2 (1988). Uncontested is the defendant's assertion that the sufficiency of evidence issue again was raised by his timely motion for judgment notwithstanding the verdict which also was denied.

The relevant evidence, construed most favorably to the plaintiffs, see *Alholm* v. *Wareham*, 371 Mass. 621, 627 (1976), is as follows: By an agreement dated July 7, 1988, the plaintiffs, without benefit of counsel, contracted to purchase a single-family dwelling in the Dorchester section of Boston from William Cranmore, a realtor and owner of several properties. At the time, the plaintiffs were unable to obtain outside financing and their purchase and sale agreement with Cranmore made provision for financing the transaction by having Cranmore mortgage the property with a commercial lender and apply the mortgage proceeds to the purchase price. Upon conveyance of the mortgaged property to them, the plaintiffs were to enter into a "wrap around"[3] mortgage arrangement with Cranmore, securing the payment of the first mortgage and the balance of the purchase price. When the plaintiffs indicated they did not have an attorney, Cranmore introduced them to the defendant who had previously represented him in other real estate matters. During August, 1988, the defendant, in order to implement the transaction, drafted and obtained signatures to a deed, a "wrap around" mortgage, a promissory note, and a document setting out certain agreements of the parties. He also, at that

---

[3]The defendant described a "wrap around" mortgage as a second mortgage device used to take advantage of in place first mortgages where buyers could not obtain conventional financing or when the first mortgage was at a favorable interest rate. The total amount of the "wrap around" mortgage would include the amount of the first mortgage plus any additional amount the seller agreed to finance against the purchase price; it would also require the buyer to provide the seller with the funds to continue first mortgage payments. See Mendler, Massachusetts Conveyancers' Handbook § 1:8.08 (3d ed. 1984 & Supp. 1995).

The purchase price of the property here involved was $150,000 and the first mortgage obtained by Cranmore was in the principal amount of approximately $90,000. The promissory note secured by the "wrap around" mortgage was for $120,000, an amount equivalent to the sum of the first mortgage and the balance due Cranmore after taking into account the deposit and cash payments made to him prior to the conveyance and in accordance with the purchase and sale agreement. Although the documents drawn by the defendant did not precisely so provide, we presume that if the plaintiffs had obtained conventional financing (see text, *infra*), the proceeds would be applied to discharge both the first mortgage and the "wrap around" mortgage.

time, attended to the recording of several of these documents at the registry of deeds. The plaintiffs paid the defendant a fee of $500. The only cost charged to Cranmore by the defendant with relation to the transaction was for the reimbursement of the cost of documentary stamps. For purposes of our analysis, we make the assumption, amply supported by the evidence, that an attorney-client relationship existed between the parties.[4] See *DeVaux* v. *American Home Assur. Co.*, 387 Mass. 814, 817-818 (1983).

The promissory note secured by the "wrap around" mortgage provided for payment of the balance due Cranmore in or within one year from the date of the conveyance of the property, it being anticipated, that, by that time, the plaintiffs would have secured their own outside financing. In the interim, the plaintiffs were to pay Cranmore a monthly amount equal to that due on the first mortgage. When the plaintiffs, after a year, were unable to obtain financing, they continued, without consulting the defendant, to pay Cranmore the agreed upon amount. Cranmore, however, failed to make payments on the first mortgage and filed for

---

[4]In the course of arguing that an attorney-client relationship existed between them and the defendant, the plaintiffs address the defendant's attempt, at trial, to analogize his role in the transaction to that of an attorney for a bank whose services, including document preparation, are charged to the borrower who obtains a purchase money loan from the bank. The analogy fails because the defendant neither gave the type of notice required by G. L. c. 184, § 17B, nor did anything which reasonably could be construed as dissuading the plaintiffs from believing that they had retained the defendant to represent them.

The defendant's conduct and the absence of an express notice by him that he represented only Cranmore created a potential conflict of interest. See *Page* v. *Frazier*, 388 Mass. 55, 63-66 (1983); S.J.C. Rule 3:07, Canon 5, DR 5-105, 382 Mass. 779 (1981). Notwithstanding that the plaintiffs have not argued the existence of, or damages deriving from, a conflict of interest, we suggest that apparent dual representation such as that engaged in by the defendant, while perhaps "common and, seemingly, approved" at one time, may now be improper, see Mallen & Smith, Legal Malpractice § 25.5, at 558 (3d ed. 1989 & Supp. 1993), and that the minimal ethical duty of an attorney similarly situated is to give clear and explicit notice to the borrower that he is representing only the lender and that the borrower should not rely on the attorney's services, notwithstanding any payment required of the borrower for those services.

bankruptcy, resulting in a foreclosure sale of the property by the holder of that mortgage in June, 1991.

In their complaint essentially alleging legal malpractice, the plaintiffs set forth three "causes of action" denominated "negligence," "breach of contract," and "consumer protection M. G. L. 93A."[5] The negligence claim contains various allegations of negligent representation by the defendant. The contract claim incorporates the allegations of negligence and states that "[a]n attorney-client relationship and an implied contract" existed between the parties which "called for the [defendant] to use his legal training, skills and experience to represent the [plaintiffs] in the purchase of the Property [and that the defendant] breached the contract." At the conclusion of the evidence, the judge allowed the defendant's motion for a directed verdict as to the negligence claim on the ground that no expert testimony had been presented. At the same time, she denied the motion as to the breach of contract claim, permitting it to go to the jury.[6]

The plaintiffs' unadorned allegation that the defendant "breached" an implied contract to use his "legal training, skills and experience" in representing them, although couched in contract terms, does nothing more than implicate the implied duty of an attorney "to exercise a reasonable degree of care and skill in the performance of his legal duties." *Glidden* v. *Terranova*, 12 Mass. App. Ct. 597, 598 (1981). See Nolan & Sartorio, Tort Law § 261 (2d ed. 1989); Mallen & Smith, Legal Malpractice § 8.5 (3d ed. 1989). On its face, this "contract" claim is nothing more than a restatement of the negligence cause of action and, therefore, subject

---

[5]The designation of "tort" or "contract" theories in the complaint is not obligatory in our practice. See Reporters' Notes to Mass.R.Civ.P. 2, Mass. Ann. Laws, Rules of Civil Procedure at 21-22 (Law. Co-op. 1982); *Hendrickson* v. *Sears*, 365 Mass. 83, 84 (1974); *McStowe* v. *Bornstein*, 377 Mass. 804, 808 (1979).

[6]The judge also allowed the G. L. c. 93A claim to go to the jury for an advisory verdict. The jury's answers to special questions were favorable to the plaintiffs. The judge, however, did not adopt these answers and dismissed the c. 93A claim. There has been no cross appeal with respect to that dismissal or the judge's allowance of the motion for a directed verdict with respect to the negligence claim.

to the same general requirement of expert evidence "to establish [a failure] to meet the standard of care owed in the particular circumstances," as properly was applied by the judge to the plaintiffs' negligence claim. *Colucci* v. *Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.*, 25 Mass. App. Ct. 107, 111 (1987).

During the trial, the plaintiff, Ruby E. Harris, told of her "expectations at closing[7] . . . that I would have full understanding of what I was doing, whether I was doing it right, or . . . wrong and. . . . [i]f the papers that I was signing were right or . . . wrong." She also testified as to her "understanding" that the . defendant would let her know "whether everything I had done on [the] purchase and sale agreement and what I was doing at the closing and everything, I was doing it right and I wouldn't be able to lose my home." Assuming, without deciding, that this testimony, viewed most generously, reflects an actionable contract to produce a specific result[8] — i.e., closing documents which were "right" — again, no determination of whether a breach occurred properly could be made by a jury without benefit of expert opinion to the effect that the documents were improper or inadequate in the circumstances.

We recognize that certain claims for breach of implied contract, as contrasted with negligence issues, may well be within a layperson's understanding, and, therefore, could be considered by a jury without the aid of expert evidence. Viewing the testimony of Ruby E. Harris in the light of the allegation in the complaint of an implied contract and giving that testimony its highest evidentiary value, three instances of breach of specific implied contracts may be discerned in the record: (1) the defendant's failure to conduct an indepen-

---

[7]There is no indication in our record that a closing, as commonly understood and defined, see Black's Law Dictionary 255 (6th ed. 1990), and involving contemporaneous exchange of documents and consideration took place.

[8]Compare *Sullivan* v. *O'Connor*, 363 Mass. 579 (1973). We intimate no opinion with respect to whether such a promise by an attorney to a client to produce a specific result is actionable. See *Colucci* v. *Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.*, *supra* at 115 n.7.

dent title search; (2) his failure to inform the plaintiffs that the conveyance to them could trigger a foreclosure under the anti-alienation clause in the first mortgage; and (3) his failure to inform the plaintiffs that the property conveyed to them was subject to unpaid real estate taxes and water and sewer charges. Even if treated as breaches of contract, these failures did not qualify for jury consideration given that the record is barren of any evidence supporting an inference that the harm which befell the plaintiffs "followed as a natural consequence . . . of the breach." *John Hetherington & Sons, Ltd.* v. *William Firth Co.*, 210 Mass. 8, 21 (1911). The sole evidence of harm to the plaintiffs is that stemming from the foreclosure of the first mortgage which they acknowledge occurred because Cranmore failed to apply their payments to that mortgage as contemplated by their agreement with him.[9]

*Judgment reversed.*

---

[9]No issue is raised of any relationship with the defendant after the "closing." The plaintiff, Ruby E. Harris, testified that she did not consider the defendant to be her lawyer after the closing, and she did not communicate with him thereafter, even when she received a foreclosure notice from the mortgage holder. The defendant also testified that he was not contacted by the plaintiffs after August, 1988.