McHugh, J.
I. BACKGROUND
This is an action in which GTE Government Systems Corporation (“GTE”) seeks to recover damages from Rackemann, Sawyer & Brewster, P.C. (“Rackemann”) for what GTE claims was Rackemann’s malpractice and conflict of interest.
The essential, and essentially uncontested backdrop for the action concerns a piece of industrial property in Needham, Massachusetts. Title to that property was held by New England Industrial Center Trust (“NEIC”), a nominee trust. On March 12, 1954, NEIC entered a long-term lease with Farrington Manufacturing Company (“Farrington”) with respect to a site on the property. The lease provided for an initial term of twenty years together with six successive five-year renewal options. The lease thus contemplated at least the possibility of a total term of fifty years.
Simultaneously with execution of the lease, NEIC and Fairing ton executed a purchase option that gave Farrington an option to purchase the property at certain specified intervals during the initial term or renewed terms of the lease, provided that the lease was in effect and was not in default when the purchase option was exercised.
The lease, of course, contained other terms but those are not significant to the dispute here at issue. Both the lease and the option were assignable.
In January of 1963, GTE purchased Farrington’s entire interest in the lease and the option.[1] On January 23, 1963, as part of that transaction, Rackemann wrote a letter addressed to GTE.[2] The letter, authored by Albert B. Wolfe, Esq., stated that, in the opinion of Rackemann, Sawyer & Brewster, NEIC had good title to the property that was the subject of the lease, that a variety of other aspects of the transaction were regular and duly recorded and that the instruments the trust had executed had been duly executed and were “binding upon” the trust.
When it sent the January 23, 1963 letter, Rackemann represented NEIC. Nevertheless, GTE with NEIC’s permission, sought from Rackemann, obtained and paid for the opinions specified in the January 23, 1963 letter. Rackemann maintained throughout the trial that the letter simply was an expression of Rackemann’s opinion as to the state of title of the property in which GTE was interested. GTE maintained that the letter expressed an opinion as to the validity of the option.[3]
In any event, in 1974, 1979 and 1984, GTE renewed the lease as the renewal time arrived. GTE also made substantial improvements on the property. In 1989, however, when it came time to decide whether to renew the lease again, GTE decided instead to exercise the purchase option. Accordingly, on June 16, 1989, GTE gave NEIC timely notice of its intention to exercise the option at the option price of $652,750.
Upon its receipt of GTE’s notice, NEIC’s trustees sent that notice to Rackemann.[4] Discussions between Rackemann and the trustees ensued. Ultimately, at the trustees behest, Rackemann sent GTE a letter dated January 11, 1990 stating that Rackemann had advised the trustees that they “would be unwarranted in recognizing the purchase option ... as valid or as now creating rights in GTE ... to purchase the property in accordance with its terms” because the option violated the rule against perpetuities.[5]
Upon receiving Rackemann’s letter, GTE filed this action against the trustees, seeking to compel them to honor the option, and against Rackemann seeking damages. In September of 1992, GTE settled its claims against the trustees by paying them $1.3 million more than the option price for the property.
GTE’s action against Rackemann contained three separate counts. Count I alleged that Rackemann negligently issued the January 23, 1963 opinion letter because that letter failed to point out potential problems regarding the rule against perpetuities, problems that could have been resolved easily by simple drafting changes. Count II alleged that Rackemann broke the contract it made with GTE in 1963 by rendering advice to NEIC in 1989[6] that directly attacked the opinion Rackemann had given to GTE in 1963. Count III alleged that Rackemann’s conduct in 1989 violated G.L.c. 93A.
The case was submitted to the jury on special questions. The jury concluded that Rackemann was not negligent with respect to the January, 1963 opinion. The juiy concluded, however, that Rackemann broke its contract with GTE in 1989 when it gave advice to NEIC and that that breach of contract damaged GTE in the amount of $400,000.[7] With respect to Count III, the jury concluded that GTE’s election to *636 give advice to Rackemann in 1989, in addition to breaking Rackemann’s contract with GTE, amounted to a knowing and willful unfair and deceptive practice.
II. APPLICABLE LAW
Following the jury’s return of the verdict on special questions, the court ordered entry of judgment in favor of Rackemann on Count I, in favor of GTE against Rackemann in the sum of $400,000 on Count II and reserved decision on the appropriate judgment with respect to Count III.
Both Rackemann and GTE have filed motions for a new trial and for judgment n.o.v. with respect to the judgments the court ordered and both have filed motions with respect to the form of the judgment that should enter with respect to Count III.
In considering a motion for judgment n.o.v., the court cannot weigh conflicting evidence. Instead, the court must uphold the verdict as long as “anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor” of the verdict winner. Brown v. Gerstein, 17 Mass.App.Ct. 558, 560 (1984).
In considering a motion for a new trial, on the other hand, the judge “may, and indeed should, judge credibility and weigh conflicting evidence.” J. Smith & H. Zobel, Rules Practice, 8 Mass. Prac. Series 442 (1977) (footnotes omitted). “A new trial may be granted whenever the judge is ‘satisfied that, by reason' of some accident, mistake, or misfortune in the conduct of the trial, a new trial is necessary to prevent a failure of justice.’ ” Davis v. Boston Elevated Ry. Co., 235 Mass. 482, 496 (1920), quoting Greene v. Farlow, 138 Mass. 146, 147 (1884). Nevertheless, the court is not empowered to set aside a verdict simply because of a disagreement with the jury’s conclusions. Instead, exercise of the court’s discretionary power is limited to instances in which the court is “satisfied that the jury have failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law.” Hartmann v. Boston Herald-Traveler Corp., 323 Mass. 56, 60 (1948). Moreover, the court should exercise its discretion in favor of granting a new trial only when the verdict “is so greatly against the weight of the evidence as to induce in [the court’s] mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice.” Scannell v. Boston Elevated Ry. Co., 208 Mass. 513, 514 (1911). In the last analysis
[a] motion 'to set aside a verdict as against the evidence is addressed to the sound discretion of the judge. “It is the right and duty of a judge presiding at the trial of a civil case to set aside the verdict of the jury when in his [or her] judgment it is so greatly against the weight of the evidence as to induce in his [or her] mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice.”
Solimene v. B. Grauel & Co., KG, 399 Mass. 790, 802 (1987).
III. DISCUSSION
1. COUNT I
GTE has moved for a new trial on Count I claiming that the evidence was strongly against the jury’s conclusion that Rackemann was not negligent with respect to the opinion it rendered on January 23, 1963.[8] This case, however, was ably tried by both sides and the jury was fully advised of the factors that the average qualified practitioner should have taken into account in rendering an opinion of this type in January of 1963.
From Rackemann’s side, the jury was presented with evidence from which it could have concluded that not only average practitioners but also the ablest and most qualified practitioners believed in January of 1963 that an option forming part of, or otherwise intimately bound up with, a lease did not violate the rule against perpetuities even though the option could be exercised at some point after the expiration of a life in being at the time the option was created plus twenty-one years. The jury could have concluded from the evidence that the foregoing view was so universally and firmly held by experienced real estate practitioners in 1963 that to have mentioned the potential adverse impact of the rule against perpetuities on a lease like the one involved in this case would have been unduly alarmist and would have invited clients to consider an issue of no practical utility or value to them.
From GTE’s side, on the other hand, the jury was presented with evidence that no decided Massachusetts case had held what Rackemann claimed the practicing real estate bar universally believed and that the Massachusetts case most closely on point at the time was Eastman Marble Co. v. Vermont Marble Co., 236 Mass. 138 (1920). That case held that an option the holder could exercise at any point within a twenty-five year period created a present equitable interest in land and violated the rule against perpetuities. Id. at 153. That case, the jury was informed, simply said in dictum that “[t]he question presented on this record has nothing to do with options for purchase or renewal contained in leases,” id. at 156. In addition, the jury was fully informed of the contents of the materials the Supreme Judicial Court cited in its opinion immediately following the statement just quoted.[9]
Against that backdrop, it was for the jury to conclude whether or not Rackemann’s issuance of the letter without any mention of the rule against perpe-tuities was or was not consistent with the standard of care required of a lawyer practicing in that day and age. On the present record, either answer was permissible and both were supported by ample evidence. Neither answer would have been so clearly against the *637 weight of the evidence that a new trial would be required. No new trial therefore is required because of the answer the jury gave.
2. COUNT II
A. LIABILITY
Rackemann urges that judgment n.o.v. should enter in its favor on Count II. Rackemann urges that it did not break any contract it made with GTE in 1963 when it provided advice to the trustees in 1989 that the option was invalid. Rackemann contends that judgment n.o.v. is warranted because this court’s instruction to the jury on the subject was clearly wrong.
In addressing the issue in its instructions, the court said as follows:
When a law firm makes a contract with a person or entity to give that person or entity a legal opinion, the law implies in that contract an agreement by the law firm that it will not later represent a different person in the same matter or in a substantially related matter in which that person’s interests are materially adverse to the interests of the person to whom the law firm gave the opinion. In the context of this case, therefore, the law implies that a part or term of the contract between GTE and Rackemann for the 1963 opinion was a promise by Rackemann that it would not in the future assert on behalf of someone other than GTE that its opinion was invalid or that it would not otherwise attack that opinion.[10]
Rackemann maintains that that instruction was wrong principally for two related reasons. First, Rackemann maintains that ethical restraints imposed on lawyers with respect to subsequent representation of clients having adverse interests in the same or related matters are designed to preserve the inviolability of client confidences. Where, as here, there was no assertion or proof that Rackemann received confidences from GTE during its 1963 representation of GTE,[11] there was no ethical prohibition or limitation on Rackemann’s subsequent representation of NEIC with respect to the any matters arising out of the 1963 letter, even if that subsequent representation is adverse to GTE.[12]
Second, Rackemann argues that even if there are some ethical restraints on Rackemann’s ability to render to NEIC in 1989 advice that conflicted with advice Rackemann rendered to GTE in 1963, those ethical restraints are not part of any contract that Rackemann had with GTE. Rackemann suggests and maintains that rules and regulations with respect to the practice of law do not automatically become part of a contract between client and lawyer. Instead, Rackemann maintains, they become part of such contracts only when they form a part of the bargain between the parties and that circumstance is not present here.
a. Ethical Restraints
The Canons of Ethics and disciplinary rules regulating the practice of law found in SJC Rule 3:07 do not, by their terms, deal with the subject of successive representation. In Massachusetts, and in other states that have not adopted the more recent ABA Model Rules of Professional Conduct, the subject of successive representation is and was treated only in ethics opinions and decided cases. Nonetheless both on a national level and within this Commonwealth, decided cases and decided ethics opinions uniformly disfavor successive representation of clients with adverse interests in the same matter.
On a national level, that disapproval was manifested in cases like Kevlik v. Goldstein, 724 F.2d 844, 850-51 (1st Cir. 1984); Brennan's, Inc. v. Brennan’s Restaurants, Inc., 590 F.2d 168, 172 (5th Cir. 1979); Westinghouse Electric Corp. v. Gulf Oil Corp., 588 F.2d 221, 227 (7th Cir. 1978); Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 757 (2d Cir. 1975); General Motors Corp. v. City of New York, 501 F.2d 639, 649 (2d Cir. 1974); Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562, 570 (2d Cir. 1973); Cord v. Smith, 338 F.2d 516, 524 (9th Cir. 1964); NFC, Inc. v. General Nutrition, Inc., 562 F.Supp. 332, 333-34 (D. Mass. 1983); Thatcher v. United States, 212 F. 801, 812 (6th Cir. 1914); Marketti v. Fitzsimmons, 373 F.Supp. 637, 639 (W.D. Wis. 1974); E.F. Hutton & Co., Inc. v. Brown, 305 F.Supp. 371, 394-95 (S.D. Tex. 1969); United States v. Standard Oil Co., 136 F.Supp. 345, 359 n.24 (S.D. N.Y. 1955); T.C. Theatre Corp. v. Warner Brothers Pictures, Inc., 113 F.Supp. 265, 268-69 (S.D. N.Y. 1953); In re Williams, 309 N.E.2d 579, 580-81 (Ill. 1974); In Re Michal, 112 N.E.2d 603 (Ill. 1953); ABA Committee on Professional Ethics Formal Opinion 71 (1932) (an attorney who did legal work in connection with a bond issue could not subsequently attack the validily of the bonds); ABA Committee on Professional Ethics Formal Opinion 64 (1932) (the draftsman of a will may not attack the will on behalf of devises); ABA Committee on Professional Ethics Informal Opinion 564 (1964) (“the lawyer who prepared a document may not attack its validity”).
In Massachusetts, too, at least one decided case expresses the same thought and conclusion. E.g., Pisa v. Commonwealth 378 Mass. 724, 726 (1979) (“in [an attorney’s] representation of the original client, there should be no prospect that he [or she] might later be employed by a different client to uphold or upset what he [or she] had done”).
To be sure, rules governing successive representation are designed in part to preserve the confidences and secrets of the initial client. See, e.g., Borges v. Our Lady of the Sea Corp., 935 F.2d 436, 439-40 (1st Cir. 1991). See Bays v. Theran, 418 Mass. 685, 685 (1994); Masiello v. Perini Corp., 394 Mass. 842, 847-48 (1985). Indeed, the desire to protect client confidences runs so deep that, at least in some cases, courts in some *638 “subsequent representation” cases have created an irrebuttable presumption that confidences were threatened. E.g., Putnam Resources, Ltd. v. Sammartino, Inc., 124 F.R.D. 530, 532 (D.R.I. 1988); T.C. Theatre Corp. v. Warner Brothers Pictures, Inc., 113 F.Supp. 265, 268 (S.D. N.Y. 1953).
But a desire to preserve client confidences is not the only force driving the rules regulating successive representation. Instead, those rules also reflect a lawyer’s duty of loyalty and help prevent the appearance of gross impropriety that would result if attorneys routinely attacked, at the instance of one client, work they had performed for another. See, e.g., United States v. Standard Oil Co., 136 F.Supp. 345, 359 & n.24 (S.D. N.Y. 1955). As one court put it
If courts protect only a client’s disclosures to his [or her] attorney, and fail to safeguard the attorney-client relationship itself — a relationship which must be one of trust and reliance — they can only undermine the public’s confidence in the legal system as a means for adjudicating disputes.
E.F. Hutton & Co. v. Brown, supra, 305 F.Supp. at 395; NFC, Inc. v. General Nutrition, Inc., supra, 562 F.Supp. at 333. The rule is thus designed to uphold the profession’s integrity and, in the process, to assure clients that the work a lawyer does is work he or she is doing for that client and that client alone. As Justice Braucher put it
In his [or her] representation of the original client, (here should be no prospect that he [or she] might later be employed by a different client to uphold or upset what he had done . . . Nor in the later representation of the adversary, should there be any possibility that the loyalty of counsel to the adversary is diluted by lingering loyalty to the original client.
Pisa v. Commonwealth, supra, 378 Mass. at 726. Accord, General Motors Corp. v. City of New York, 501 F.2d 639, 649 (2d Cir. 1974). See Thatcher v. United States, 212 F. 801, 811-12 (1914), appeal dismissed, 241 U.S. 644 (1915).[13]
In sum, rules governing successive representation are designed not only to preserve client confidences but also to advance a lawyer’s duty of loyalty and to bolster the profession’s integrity. All of those interests, singly and in the aggregate, prohibit, and always have prohibited, lawyers from attacking or asserting the invalidity, at the instance of one client, of work the same lawyer has performed for another client even when the attack involves no disclosure of the first client’s confidences.
b. Contract
As Rackemann has pointed out, every violation of the Canons of Ethics or of a disciplinary rule does not (rigger civil liability. Fishman v. Brooks, 396 Mass. 643, 649 (1986). “While an attorney may be liable in damages to a person injured by his or her misconduct, that liability must be based on a recognized and independent cause of action and not on ethical violations.” Sullivan v. Birmingham 11 Mass.App.Ct. 359, 368 (1981).
Here, however, thejurywas not told that any breach of an ethical rule generally gave rise to liability or that it could base a finding of liability in this case solely on violation of an ethical obligation. Instead, thejurywas instructed that an implied term of the 1963 contract between Rackemann and GTE was a promise that Rackemann would not later attack or assert the invalidity of the opinion it had given in its 1963 letter.
There is ample authority for the proposition that the court can supply an essential omitted term of a contract even if the parties have failed to do so themselves. Restatement (Second) of Contracts §204. Cf. Caggiano v. Marchegiano, 327 Mass. 574, 579 (1951). Sometimes the process of supplying such terms is described as an interpretive process. Sometimes it is described as a process of divining terms that the parties would have included in their contract had they thought about, discussed or directly considered the issue in question. But the court’s power to search for probable agreement and the court’s power to assemble an omitted term from those the parties themselves supplied are not the court’s only powers. Instead, “[w]here there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process.” Restatement (Second) of Contracts §204, comment d.
An implied covenant of good faith and fair dealing is part of every Massachusetts contract. Starr v. Fordham, 420 Mass. 178, 184 (1995). That covenant prohibits all parties to the contract from taking action that will have the effect of destroying or injuring the right of another party to receive the contract’s benefits. Anthony’s Pier Four, Inc. v. HBC Associates, Inc., 411 Mass. 451, 471-72 (1991). See generally Restatement (Second) of Contracts §205. An agreement by an attorney that he or she will not, in the service of someone else, attack the validity of an opinion that he or she has rendered to a client is but a particularized manifestation of that general obligation of good faith and fair dealing. I am of the opinion, therefore, that such an agreement is part of every contract a Massachusetts attorney makes when he or she agrees to provide a legal opinion to a client.[14]
The agreement just described is no mere technicality, no tripwire detail conjured by courts and academics to further burden modern law’s already complicated practice. Instead, that agreement goes to the profession’s very heart. A lawyer’s duty and correlative promise of loyalty are central professional obligations and always have been. Whether or not explicitly discussed when representation begins, the implicit promise of loyalty rightly lies near the top of every client’s expectations. Moreover, as GTE pointed *639 out in its brief, “Rackemann [like any lawyer who renders an opinion] was in a particularly advantageous position, by reason of having rendered the prior opinion, to purport to interpret that opinion, and to purport to provide credible advice and/or testimony as to its meaning and scope.” GTE Opposition to Posttrial Motions of Defendant Rackemann, Sawyer & Brewster, P.C. at 20. That is, and always will be, the case when an attorney purports to interpret, construe or apply an opinion he or she earlier rendered. Even if the lawyers’s construction, interpretation or application of her earlier opinion is wrong, questionable or doubtful, it is very likely to cany an aura of unquestioned authority because it comes from the mouth of the very person who made the original utterance. The attorney who rendered the original opinion thus retains a unique power to strip from that opinion its force and meaning and in the process to deprive the person for whom he rendered it of whatever benefit might otherwise flow from its existence.
B. CAUSATION
Rackemann also argues that, even if its 1989 actions amounted to a breach of the contract it made with GTE in 1963, that breach of contract caused GTE no harm. On the evidence before it, however, the jury was warranted in reaching a contrary conclusion.
On the evidence presented to it, the jury was warranted in concluding that the advice Rackemann gave NEIC in 1989 was a “substantial factor,” at the very least, in NEIC’s refusal to convey to GTE the property the option covered.[15] Rackemann does not strongly argue otherwise. Instead, Rackemann’s argument is that any other lawyer to whom NEIC referred the same question about the option in 1989 would have given GTE precisely the same advice and that advice would have had produced precisely the same decision by NEIC. Rackemann therefore argues that, although there is a causal relationship between what Rackemann did and what the trust did, that causal relationship flows from sound lawyerly advice Rackemann gave, not from any breach of Rackemann’s contract with GTE.
The evidence before the jury, however, did not compel a conclusion that NEIC would have received the same advice from any other competent attorney who considered the problem in 1989. The author of the 1963 opinion, after all, testified that it was unnecessary to mention the rule against perpetuities in his opinion because of the widespread consensus among practitioners at the time that the rule was inapplicable to options like the one the GTE contract involved. Necessarily, the jury accepted that argument.
The only new development in the law between the 1963 opinion and the time Rackemann considered the matter again in 1989 was the Supreme Judicial Court’s decision in Certified Corp. v. GTE Products Corp., 392 Mass. 821 (1984). That opinion, the jury was warranted in concluding, although dealing with an “option in gross,” contained dictum that was at least as favorable, if not more favorable, to the validity of GTE’s option as the law in existence at the time the 1963 opinion was written. Id. at 823-24 n.5. The jury, therefore, was not required to conclude that any competent lawyer would have given GTE in 1989 the advice Rackemann gave.
One might still argue that GTE’s harm flowed from the content of Rackemann’s advice, not from the fact that Rackemann gave that advice. In my view, that argument cuts the matter too fine for it would lead to wholly unacceptable results. Assume, for example, a question with two inconsistent but arguable answers. Assume that a lawyer gives client A one of those arguable answers and Client A acts in accordance with it. The lawyer then gives client B, whose interests in the matter are opposed to client A’s, the other answer. Client B acts in accordance with that answer to the injury of client A. Under those circumstances — circumstances not far removed from those this case presents — to say that the lawyer is not liable for the damage to A because he gave B sound advice simply blinks away the problem. When there is this type of contractual breach and that breach is a substantial factor in producing harm then the lawyer is liable for the harm regardless of the quality of the advice the lawyer gave to the second client.[16]
C. DAMAGES
While urging that the jury’s finding on liability was correct, GTE asserts that the jury’s damage award was insufficient because it failed to include the additional $1,342,250 GTE spent to acquire the property when NEIC refused to convey it.[17] The evidence was virtually undisputed that GTE ultimately paid NEIC $ 1,995,000 to acquire the property and that that price was $1,342,250 more than the option price of $652,750.
The short answer to GTE’s contention is that, although the jury could have concluded that the increased cost of the property was part of the damage Rackemann’s 1989 advice produced, the jury also was warranted in concluding that the option did not violate the rule against perpetuities,[18] that the option was therefore valid and that, had GTE pursued the litigation, it would have acquired the property at the original option price. On the evidence, the jury also could have concluded that pursuit of the litigation through judgment would have been less expensive than paying NEIC the additional $1.3 million but that the evidence was insufficient to permit a reasoned conclusion regarding the amount of additional legal fees or rental pursuit of the litigation through judgment would have entailed.
The jury was instructed that it could award to GTE only those damages that Rackemann’s action was a substantial factor in producing and that Rackemann had an obligation to mitigate whatever damages the Rackemann’s improper conduct produced. The jury *640 verdict on deimages, while not the only one it could have reached, was amply supported by the evidence and represented a perfectly reasonable application of the instructions to the evidence.
3.CHAPTER 93A
Rackemann argues that it is entitled either to a judgment n.o.v. or to a new trial with respect to the jury’s verdict on Chapter 93A.[19] I disagree.
The relationship between the implied contractual term Rackemann breached and the implied covenant of good faith and fair dealing provided a very strong basis for the jury to conclude that Rackemann’s actions amounted to an unfair and deceptive act or practice. See Anthony’s Pier Four, Inc. v. HBC Associates, Inc., 411 Mass. 451, 476 (1991).[20]
In addition, the jury was warranted in concluding that the unfair and deceptive act or practice was knowing or willful. In that regard, GTE was not required to prove that Rackemann knew its actions violated the law. GTE was required to prove either a conscious desire to bring about a result that in fact violated the law or knowing action that led to that result. Montanez v. Bagg, 24 Mass.App.Ct. 954, 956 (1987) (rescript). See Whelihan v. Markowski, 37 Mass.App.Ct. 209, 212-13 (1994).
Here, before Rackemann rendered its 1989 opinion, the two Rackemann partners preparing that opinion knew of the existence of the 1963 opinion. Although they testified at trial that they believed the opinion touched only on rather “mechanical” aspects of the state of title, the jury was not required to believe that testimony, particularly in view of the substantial evidence in the case that the 1963 opinion dealt with the option’s validity. The two never checked with the author of the 1963 opinion, who was available for checking. Had they done so, they would have learned that he viewed the 1963 opinion as an opinion on the option’s validity. To have proceeded as Rackemann did to render the 1989 opinion without first determining to a certainty the scope of the 1963 opinion was to engage in conduct which the jury was well warranted in concluding amounted to a knowing or willful violation of Chapter 93A.
Although this case was submitted to the jury for the jury’s conclusion with respect to whether or not Rackemann had committed a violation of G.L.c. 93A and whether, if so, that violation was knowing or willful, I reserve decision on the question whether an affirmative answer to both of those questions would produce double or treble damages. On the basis of this record, I am of the opinion that double damages are appropriate. Treble damages, being the most punitive sanction c. 93A permits, should, in my view, be reserved for the most egregious and consciously self-dealing conduct. Here Rackemann’s conduct, wrong and knowingly or willfully unfair and deceptive though the jury found it to be, is not of that type. The conduct was produced not by an unprincipled and avaricious self-interest but by a failure to think through and give generous application to fundamental principles that must govern a lawyer’s continuing fidelity to a former client. Double damages are, at the very least, an adequate punitive sanction for that conduct.[21]
4. MOTION TO AMEND THE JUDGMENT (Paper No. 57.4)
When the judgment on Counts I and II entered, interest was calculated from February 14, 1990, the date on which this action commenced.[22] Rackemann argues that, because all of the amounts GTE recovered were designed to compensate it for losses that occurred after the action commenced, interest should run from the date the losses were actually incurred, not from the date the action began. In that regard, Rackemann cites Sterilite Corp. v. Continental Casualty Co., 397 Mass. 837 (1986).
Sterilite, it is true, contains substantive principles applicable to interest calculations of a type this case might require. “Establishing the date of breach or demand!, however,] is a determination for the trier of fact, and, where trial has proceeded before a jury, neither the judge nor an appellate court can make such a determination.” Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass. 118, 125 (1986). I am of then opinion that the same principle applies to findings concerning when damages were incurred. It thus is too late to seek such findings now.
5. MOTION FOR ENTRY OF JUDGMENT NUNC PRO TUNC (Paper No. 63)
GTE, pointing to the length of time that these motions have been under advisement, seeks an order for entry of judgment nunc pro tunc so that post-judgment interest will begin to run as of the date that the motions were argued. The effect of allowing that motion would be to commence accrual of interest on the punitive portion of the award under G.L.c. 93A and commence accrual of interest on interest on the remainder of the judgment.
I regret the length of time that these motions have been under advisement. But interest has been accruing since the action was filed at a rate which, for the vast bulk of that period, has been well in excess of the market rate. In addition, plaintiff is entitled to, and will, recover attorneys fees. As a result, plaintiff will be made more than whole for any losses the jury found it was entitled to recover and I am of the opinion that no further enhancement of that recovery is appropriate or necessary.
6. MOTION FOR AWARD OF ATTORNEYS FEES (Paper No. 60)
GTE seeks an interim award of attorneys fees, interim because all of its legal services in connection with this matter were not completed by the time the fee application was made. In support of the application, GTE submitted affidavits and time records from its counsel supporting the amount of time counsel had *641 expended and the costs that they had incurred in proceeding with the action. Rackemann has not contested the number of hours expended by GTE’s counsel, the hourly billing rates those counsel charged or the dollar amount of the costs counsel have incurred. Instead, Rackemann has challenged the overall claim for attorneys fees by asserting that GTE has made no effort in its fee application to allocate the hours expended between those spent on the Chapter 93A portions of its claim and those spent on other portions or, at the very least, between Count I, on which GTE was unsuccessful and Count II, on which it succeeded.
Often when claims under G.L.c. 93A are commingled with claims arising at common law or under some other statutory scheme, fees are awarded solely in connection with the claim under Chapter 93A. E.g., Jet Line Services, Inc. v. American Employers Insurance Co., 404 Mass. 706, 717 (1989). As Rackemann candidly concedes, however, where other claims are “intertwined factually with the merits of the claim under c. 93A,” Wasserman v. Agnastopoulos, 22 Mass.App.Ct. 672, 682, rev. denied, 398 Mass. 1105 (1986), segregation between 93A claims and others is not required.
Here, Rackemanris 1963 activities and its 1989 activities are part of a continuum. Without the 1963 opinion, GTE would have had no claim for Rackemanris 1989 opinion. Rackemanris assertion that the law had changed between 1963 and 1989 required proof of what practitioners perceived the law to be in 1963 as well as what they perceived it to be in 1989.[23] The testimony of witnesses as to the state of the law in 1963 thus would have been necessary even if no claim had been made that Rackemanris 1963 opinion letter was negligently issued. Similarly, Rackemanris assertion that the 1963 opinion letter dealt solely with the state of title, and not with the option’s validity, required a thorough examination of the genesis of the 1963 opinion and the meaning ascribed to it when it was issued.
The point of all this is that the vast bulk of the time GTE’s lawyers spent dealing with the 1963 matters is time they would have been required to spend even if GTE simply had sought recovery for Rackemanris activities in 1989. To be sure, with tire 1989 activities alone at issue, some of the emphasis, some of the time and some of the precision with which the 1963 matters were examined, explored and presented would have been unnecessary. Based on my view of the case, see Heller v. Silverbranch Construction Corp., 376 Mass. 621, 630-31 (1978), I conclude that the time GTE’s counsel would have saved had they been concerned with Rackemanris 1989 activities alone would, more probably than not, have amounted to 15 percent.
Turning then to the fees themselves, it is now clear that fees awarded under G.L.c. 93A, are to be determined in accordance with the so-called “lodestar” method long employed in the federal courts. In essence, “[a] fair market rate for time reasonably spent preparing and litigating a case is the basic measure of a reasonable attorney’s fee under State law as well as Federal law.” Fontaine v. Ebtec Corp., 415 Mass. 309, 326 (1993). See also American Trucking Associations, Inc. v. Secretary of Admin., 415 Mass. 337, 352 (1993); Smith v. Consalvo, 37 Mass.App.Ct. 192, 196-97 (1994).
Here, GTE seeks total compensation for fees in the amount of $313,699.50. The supporting affidavits show an expenditure of 1,330 hours for an approximate hourly charge of $235. Given the nature of the issues this case raised, the complexity of those issues and the intensity with which each issue was contested, I am of the opinion that the total number of hours expended over the life of the case solely on matters involving GTE’s claims against Rackemann was reasonable.[24] Although $235 per hour as an average hourly charge for each of those 1,330 hours is at the very edge of reasonableness, it is not over the edge. I find, therefore, that GTE is entitled to attorneys fees in the amount of $313,699.50 less the 15% it would have saved if it had not pursued its unsuccessful claim regarding the 1963 opinion. The recoverable fee thus amounts to $266,644.58.
Finally, GTE seeks costs and disbursements in the amount of $27,515.37. Of that amount, $185 is for a filing fee, $257 is witness fees, $14,029 is expert witness fees and the rest could be classified in any other business or profession as overhead. Although G.L.c. 93A permits recovery of costs associated with the litigation, it does not defray overhead. Costs are therefore allowed in the amount of $14,471.
ORDER
In light of the foregoing, judgement will enter:
1. In favor of defendant, Rackemann, Sawyer & Brewster, P.C. dismissing Count I of the complaint;
2. In favor of plaintiff, GTE Government Systems Corporation against defendant, Rackemann, Sawyer & Brewster, P.C., in the amount of $400,000 plus interest; and
3. In favor of plaintiff, GTE Government Systems Corporation against defendant, Rackemann, Sawyer & Brewster, P.C., in the amount of $400,000 plus interest[25] plus $400,000 without interest[26] plus $281,115.58 without interest[27] for a total recovery under said Count $1,081,115.58, $400,000 of which is with interest and the balance of which is without.

Actually the purchase was made by GTE’s predecessor, Sylvania Electric Products, Inc. After the transaction was consummated in 1963, Sylvania Electric Products, Inc., underwent a number of corporate name and responsibility changes and ultimately emerged on or about March 21, 1984 as GTE Government Systems Corporation, the plaintiff here. There is no present dispute about GTE’s accession to whatever contractual rights Sylvania Electric Products, Inc. had. Because nothing of present significance turns on the fact that the purchase was actually made by GTE’s predecessor, I have *642 ignored that fact throughout this recitation.

Although not material to the present motions, the parties differed in some respects at trial concerning precisely when during the course of the Farrington-GTE transaction theletter was requested and written and differed with respect to why it had been sent.

Ultimately, the jury was asked to determine which of the two views of the letters was correct.

A contested issue at trial concerned whether the trustees sent the letter to Rackemann solely for the purpose of determining whether GTE had complied with technical formalities concerning tender of the notice or whether the trustees sent the letter to Rackemann for advice concerning whether the option was valid and properly exercisable.

Rackemann’s letter contained much greater detail and explained the setting, insofar as composition of the trustees was concerned, in which it was rendering its opinion. Nonetheless, the quoted portion of the letter embodies Rackemann’s ultimate conclusion.

As stated, the letter Rackemann sent to GTE was dated January 11, 1990. The advice Rackemann gave to NEIC preceded the letter and formed the basis for GTE’s claim.

Both sides agree that in all probability, the jury’s verdict awarded GTE the additional rent it had to pay to NEIC for the period between the time when the property should have been conveyed to GTE and the time it actually was and that legal expenses that GTE incurred before reaching its settlement with NEIC. The evidence supports the parties’ agreement in that regard.

In some senses, Counts I and II of the complaint are alternatives to each other. In other senses, however, a verdict in favor of GTE on both counts would not have been inconsistent. One of GTE’s arguments was that, even if the option did not violate the rule against perpetuities, there were sufficient questions about the option’s conflict with that rule that the average qualified practitioner in January of 1963 should have alerted GTE to the potential problem so that drafting changes could have been made in the documents and all doubts about the validity of the transaction forever removed. That argument, if accepted, did not depend for its success on a conclusion that the option in fact violated the rule.

Those materials were Mann, Crossman & Paulin, Ltd. v. Registrar of Land Registry, [1918] I Ch. 202 and cases collected in 27 Yale L.J. 885.

There were, of course, other instructions to the jury but the instruction just quoted lay at the heart of the dispute between Rackemann and GTE over Rackemann’s 1989 opinion. There was no dispute between the parties that there had been a contract between Rackemann and GTE with respect to the 1963 opinion although they disagreed over whether that contract included the implied term described in the instruction. As mentioned earlier, see footnote 3, supra, the parties disagreed as to what Rackemann’s 1963 letter said. Rackemann maintained that the letter simply expressed an expression opinion as to the state of title on the property. GTE maintained that the latter was an expression of an opinion that the option was valid and binding on the trustees. Given that conflict, the jury was told that it had to decide what the 1963 letter said before it could determine whether Rackemann’s 1989 advice broke the 1963 contract Rackemann had made with GTE.

Initially, there were questions whether GTE should be viewed as a “client” of Rackemann’s with respect to the January 23, 1963 letter. By the time the case went to the jury, however, those questions had been resolved and no issue in that regard was presented to the jury for its consideration.

Initially, this case also contained a claim that, at the time it rendered its opinion adverse to GTE in 1989, Rackemann was representing GTE on an unrelated matter. No issue in that regard was submitted to the jury. This is not, therefore, a case that turns for present purposes on simultaneous representation of clients with differing interests.

The question whether successive representation is prohibited in a given instance frequently turns on whether the subsequent representation bears a “substantial relationship” to the former representation. E.g., Kevlik v. Goldstein, 724 F.2d 844, 850-51 (1st Cir. 1984); Westinghouse Electric Corp. v. Gulf Oil Corp., 588 F.2d 221, 227 (7th Cir. 1978); Masiello v. Perini Corp., 394 Mass. 842, 849 (1985). Here, the jury was instructed that Rackemann would be liable only if, in 1989, it attacked the validity of the opinion it had rendered on January 23, 1963. However one defines and measures “substantial relationship,” there can be no doubt that such a relationship is present if a lawyer attacks her own handiwork.

I reached this result as a matter of law. Although it was not asked to do so, the jury could have reached the same result as a matter of fact. The result is consistent with Rule 1.9(a) of the ABA Model Rules of Professional Conduct, a broadly prophylactic rule that clearly extends beyond the use of client confidences to serve differing interests. Although the ABA Model Rules have not yet been adopted in Massachusetts, there was expert testimony presented by Rackemann during the course of the trial from which the jury could have concluded that the Model Rules nonetheless embody a custom and practice now adhered'to by lawyers practicing within the Commonwealth. See Rackemann Brief at 9. Custom and practice, in turn, can be the basis for an implied contractual term. See Restatement (Second) of Contracts §222.

To be sure, Rackemann rendered its advice some six months before the property had to be conveyed under the option. NEIC, advised by its subsequent counsel, William Abbott, elected not to make the conveyance. Rackemann’s argument that as a matter of law that decision broke any otherwise existing causal link between Rackemann’s action and harm to GTE is unpersuasive. Rackemann’s 1989 opinion was, undeniably, part of the backdrop against which NEIC acted in deciding whether or not to convey in July. Given the concerns NEIC professed to have about honoring the option, real, the juiy could well that the existence of Rackemann’s 1989 opinion would have made any later decision to convey far more difficult, and perhaps dangerous, to make than it otherwise would have been. The jury, in sum, was warranted in concluding that Rackemann’s 1989 opinion was a substantial factor in producing harm to GTE notwithstanding Mr. Abbot’s later advice or the NEIC’s ultimate decision not to convey.

No one objected to instructions telling the jury that the breach had to be a substantial factor in causing damage to GTE. See Restatement (Second) of Torts §431. A more appropriate instruction probably would have been have focused on whether the harm to GTE was a foreseeable consequence of Rackemann’s breach. See Restatement (Second) of Contracts §351. Arguments can be made both ways about whether a “foreseeability” would have been more or less favorable to Rackemann than the “substantial factor" instruction actually given. In any event, no one has based any posttrial claim on use of the latter.

As stated earlier, both sides agree that the jury’s award of $400,000 was based on the litigation costs of $270,000 GTE incurred in the action it brought against NEIC to compel the latter to honor its option plus the $130,000 in additional rental that GTE was required to pay to NEIC while that suit was pending.

Such a conclusion, of course, would have been perfectly consistent with, and a basis for, the jury’s verdict on Count I.

Rackemann also argues that the court should not enter judgment based on the jury’s verdict but instead should enter *643 a verdict based on its own view of the evidence applicable to Count III. Count III, however, was not submitted to the jury on an advisory basis. Instead, the 93A claims were submitted to the jury for the jury's final decision. Compare, e.g., Harris v. Magri, 39 Mass.App.Ct. 349, 352 & n.6 (1995), with, e.g., Melo-Tone Vending, Inc. v. Sherry, Inc., 39 Mass.App.Ct. 315, 318 (1995).

Rackemann’s contention that GTE suffered no harm from Rackemann’s violation of G.L.c. 93Ais wholly unpersuasive. This is a case in which the violation of Chapter 93A sprang from facts similar, if not identical, to the contractual breaches. As a consequence, violation of Chapter 93A did produce damages, albeit damages that were identical to those produced by the breach of contract.

Under c. 93A, no less sanction is available for a knowing or willful violation of the chapter.

The judgment, of course, was not final. See Mass.R.Civ.P. 54(b).

Rackemann’s “change in the law” assertions, even as they applied solely to the 1989 opinion, were not simply matters to be resolved by judicial notice. The “law” questions that permeated this case had much more to do with what practitioners believed the law was at various times than they did with what a court would conclude, as a matter of law, the law actually was at those times.

In its fee application, GTE has eliminated all claims for fees incurred in connection with its claims against NEIC.

That $400,000 is in lieu of, and not in addition to, the $400,000 that plaintiff recovered under Count II. See, e.g., Calimlim v. Foreign Car Center, Inc., 392 Mass. 228, 235-36 (1984).

Interest is not recoverable on punitive damages. McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 716-17 (1990).

Interest is not recoverable for attorneys fees. Patry v. Liberty Mobilehome Sales, Inc., 394 Mass. 270, 272 (1985).